UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Application of VIOLY MCCAUSLAND-SEVE,<br><br>                    Petitioner,<br><br>For an Order Pursuant to Article 75 of the CPLR to<br>Stay the Arbitration of a Certain Controversy<br><br>          -against-<br><br>CORE VALUE PARTNERS (LATIN AMERICA),<br>LLC,<br><br>                 Respondent. | 11 Civ. 2773 (VM) (DF) |

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE that pursuant to 28 U.S.C. §§ 1332, 1441 and 1446 and

Local Civil Rule 81.1, Respondent Core Value Partners (Latin America), LLC ("Core Value")

hereby gives notice of removal to the United States District Court for the Southern District of

New York of the above-captioned proceeding, which was commenced by the filing of a Notice

of Petition and Petition Under CPLR 7503 to Permanently Stay or Enjoin Arbitration and

Disqualify Chadbourne & Parke LLP as Counsel (the "Petition") by Petitioner Violy

McCausland-Seve ("McCausland"), in the Supreme Court of the State of New York, County of

New York, on April 20, 2011 under Index No. 651052/2011.

In support of removal, Core Value states as follows:

1.    This Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b) in that it is being filed within thirty (30) days of the first date on which Core Value was served with a copy of (or had notice of) the Notice of Petition and Petition.  Chadbourne & Parke LLP ("Chadbourne"), Core Value's counsel, received copies of McCausland's Notice of Petition and Petition on April 20, 2011.

2.    The Supreme Court of the State of New York, County of New York is located within the Southern District of New York.

3.    Pursuant to 28 U.S.C. § 1446(a) and Local Civil Rule 81.1(b), copies of all pleadings and other papers served on Core Value as the removing Respondent are attached hereto as Exhibit A, including the Notice of Petition and the Petition Under CPLR 7503 to Permanently Stay or Enjoin Arbitration and Disqualify Chadbourne & Parke LLP as Counsel, with accompanying affidavits, affirmations, and exhibits; the Request for Judicial Intervention; the Memorandum of Law in support of the Petition; the Statement in Support of Request for Assignment to Commercial Division; and the Affidavit of Service upon Core Value.

4.    Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal will be filed promptly with the New York County Clerk.

5.    By filing this Notice of Removal, Respondent does not waive any available defenses.

## THIS COURT HAS DIVERSITY JURISDICTION

6.     This Court has original jurisdiction over this proceeding pursuant to 28 U.S.C. § 1332, and therefore this proceeding is removable to this Court pursuant to 28 U.S.C. § 1441.

7.     As set forth more fully below, the parties to this proceeding are completely diverse, and neither Core Value nor any of its members are citizens of the State of New York.

8.     McCausland resides at 44 West 77th Street, New York, New York, within New York County.  Upon information and belief, at the time McCausland commenced the proceeding in state court, and at the time of removal, McCausland was (and is) an individual who is a citizen of the State of New York or, alternatively, was (and is) a citizen of a foreign country.

9.     At the time McCausland commenced the proceeding in state court, and at the time of removal, Core Value was (and is) a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Miami, Florida, at 10605 SW 62nd Avenue, Miami, Florida 33156, within Miami-Dade County.  At the time McCausland commenced the proceeding in state court, and at the time of removal, the only members of Core Value were Talbert I. Navia and Blanca R. Navia, both citizens of Miami, Florida, who reside at 10605 SW 62nd Avenue, Miami, Florida 33156, within Miami-Dade County.

10.    McCausland and Core Value are currently adverse parties in an arbitration pending before the American Arbitration Association, which will be venued within the Southern District of New York.  Core Value has retained Chadbourne to represent it in the arbitration.

11.   In the Petition, McCausland seeks the following relief:  an Order permanently staying and enjoining the arbitration between McCausland and Core Value, and an Order disqualifying Chadbourne from representing Core Value in its arbitration dispute with McCausland.

12.   McCausland seeks relief that would result in a loss to Core Value that has a value in excess of $75,000.  See Hough v. Merrill Lynch, Pierce, Fenner & Smith, 757 F. Supp. 283, 287 (S.D.N.Y. 1991) (measuring the amount in controversy as the amount potentially at stake in the underlying arbitration).  The amount in controversy in the arbitration is in excess of $75,000.  Further, if Core Value were forced to retain new counsel to prosecute the arbitration, Core Value would likely incur more than $75,000 in expenses in the process of transitioning the case to new counsel to prosecute the arbitration.

## THE LONE RESPONDENT CONSENTS
## TO REMOVAL OF THIS ACTION

13.   Core Value, the lone Respondent in this matter, consents to this removal.

## CONCLUSION

For the foregoing reasons, pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, and pursuant to Local Civil Rule 81.1, this Court has jurisdiction over this proceeding and this proceeding is properly removed from the Supreme Court of the State of New York, County of New York, to the United States District Court for the Southern District of New York.

Dated:     New York, New York
           April 25, 2011

CHADBOURNE & PARKE LLP

By

Thomas E. Butler (TB - 5598)
A Member of the Firm
Attorneys for Respondent Core Value
Partners (Latin America), LLC
30 Rockefeller Plaza
New York, New York  10112
(212) 408-5100

# Notice of Removal

# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

Application of VIOLY MCCAUSLAND-SEVE,

Petitioner,

For an Order Pursuant to Article 75 of the CPLR to
Stay the Arbitration of a Certain Controversy

-against-

CORE VALUES PARTNERS (LATIN AMERICA),
LLC,

Respondent.

Index No. b͟5͟1͟0͟5͟2͟ /͟2͟0͟1͟1͟

NOTICE OF PETITION
UNDER CPLR 7503 TO
PERMANENTLY STAY
OR ENJOIN
ARBITRATION AND
DISQUALIFY
CHADBOURNE &
PARKE LLP AS
COUNSEL

PLEASE TAKE NOTICE that upon the annexed Petition of VIOLY MCCAUSLAND-SEVE and the affidavits and exhibits attached thereto, and the Memorandum of Law in Support of Petition to Permanently Stay or Enjoin Arbitration and Disqualify Chadbourne & Parke LLP as Counsel, the undersigned will make an application to this Court at the Motion Support Office, Room 130 at the Courthouse located at 60 Centre Street, New York, New York on May 2, 2011, at 9:30 A.M., for an order pursuant to C.P.L.R. § 7503 to stay the arbitration proceeding initiated by Respondent Core Values Partners (Latin America) LLC entitled *In re Core Value Partners (Latin America) LLC, and Violy McCausland-Seve,* AAA No. 131 48 Y 00889 11, on the grounds that (1) the parties did not agree to arbitrate any of the claims asserted by Respondent in the Arbitration Demand, and (2) the agreement between the parties is invalid and unenforceable under New York law, and will also petition to disqualify Respondent's attorneys, Chadbourne & Parke LLP, under the New York Rules of Professional Conduct.

Pursuant to CPLR § 403, Respondent's answer and supporting affidavits, if any, are required to be served upon the undersigned at least two days before the date this Petition is noticed to be heard. If this notice is served upon Respondent at least twelve days before the time at which the Petition is to be heard, Respondent's answer and any supporting affidavits are required to be served upon the undersigned at least seven days before the date this Petition is noticed to be heard. In that case, Petitioner's reply papers, if any, shall be served at least one day before such time.

Dated: New York, New York
April 20, 2011

JENNER & BLOCK LLP

By: _____
Andrew Weissmann
Katya Jestin
919 Third Avenue, 37th Floor
New York, New York 10022
(212) 891-1600

SOLOMON BLUM HEYMANN LLP
Mark R. Kook
40 Wall Street, 35th Floor
New York, New York 10005
(212) 267-7600

Attorneys for Petitioner

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

--------------------------------------------------

Application of VIOLY MCCAUSLAND-SEVE,

Petitioner,

For an Order Pursuant to Article 75 of the CPLR to
Stay the Arbitration of a Certain Controversy

-against-

CORE VALUE PARTNERS (LATIN AMERICA),
LLC

Respondent.

--------------------------------------------------

Index No. 651052/2011

**PETITION UNDER
CPLR 7503 TO
PERMANENTLY
STAY OR ENJOIN
ARBITRATION AND
DISQUALIFY
CHADBOURNE &
PARKE LLP AS
COUNSEL**

Petitioner VIOLY MCCAUSLAND-SEVE ("McCausland"), by and through her

attorneys, for her Petition under CPLR § 7503(b), respectfully alleges as follows:

### NATURE OF THE ACTION

1.          This is a special proceeding for a permanent stay of the arbitration entitled

*In re Core Value Partners (Latin America) LLC, Claimant, and Violy McCausland-Seve,*

*Respondent,* AAA No. 131 48 Y 00889 11 (the "Arbitration"). As explained below, and more

fully in the accompanying Memorandum of Law in Support of Petition to Permanently Stay or

Enjoin Arbitration and Disqualify Chadbourne & Parke LLP as Counsel ("Memorandum of Law

in Support of the Petition"), the claims asserted against Petitioner in the Arbitration are not

arbitrable because (1) the parties did not agree to arbitrate any of the claims asserted by

Respondent in the Arbitration Demand, and (2) the agreement between the parties is invalid and

unenforceable under New York law.

1

2.          Petitioner also petitions to disqualify Respondent's attorneys, Chadbourne & Parke LLP, from representing Respondent in the Arbitration under the New York Rules of Professional Conduct.

## PARTIES, JURISDICTION AND VENUE

3.          Petitioner Violy McCausland-Seve is a mergers and acquisitions advisor residing at 44 West 77th Street, New York, New York. Petitioner conducts business at 10 East 53rd Street, 34th Floor, New York, New York.

4.          Upon information and belief, Respondent Core Value Partners (Latin America) LLC ("Core Value") is a Delaware limited liability company with its principal place of business at 10605 SW 62nd Avenue, Miami, Florida 33156, and Core Value's sole member is Talbert Navia, Esq. ("Navia"), a partner in the law firm of Chadbourne & Parke LLP, which has offices in New York, New York. Navia conducts business in this county and executed the agreement at issue in the underlying arbitration in this county.

5.          Venue is proper in this Court under CPLR § 7502(a)(i) because this special proceeding is brought in the county specified in the arbitration agreement and both parties conduct business in this county.

## FACTUAL BACKGROUND

6.          Petitioner McCausland is recognized as one of the most innovative advisors on Wall Street focusing on Latin America. Over the course of her 30-year career, McCausland pioneered restructuring, mergers & acquisitions, and capital raising for Latin American companies, and has held prestigious leadership roles in the financial advisory and deal-making sectors. *See* Affidavit of Violy McCausland-Seve dated April 18, 2011 ("McCausland Aff.") ¶¶ 8-11.

7.        In 2003, Petitioner McCausland founded VMS Associates LLC, an investment advisory firm which does business under the name "Violy & Co."

8.        Since then, McCausland has run Violy & Co. as its sole owner and originator of business, leveraging her expertise in Ibero-American markets and experience serving Latin American companies. Violy & Co. has been in operation since its founding and has always operated under the formal name, VMS Associates LLC, a limited liability company with a sole owner, McCausland. *See* Affidavit of Thomas Masillo ("Masillo Aff.") ¶¶ 6-8. Violy & Co. has never operated through any other entity. *See id.*

9.        Since at least 2006, Talbert Navia, Esq. ("Navia"), an attorney and head of Chadbourne & Parke LLP's Latin America and Private Equity practices, and the Chadbourne firm, have served as legal counsel to McCausland and Violy & Co. in a wide range of matters, including employment issues, litigation, business formation and estate planning. *See* McCausland Aff. ¶¶ 12-17; Affirmation of Mark Kook, Esq. ("Kook Aff."), Ex. B (bills for legal services provided by Chadbourne & Parke LLP).

10.        In 2007, Navia and Chadbourne were advising McCausland on the creation of a complex series of personal trusts and a new set of business structures through which McCausland could more efficiently conduct business. *See* McCausland Aff. ¶ 18; Kook Aff., Ex. B. The thousands of dollars worth of bills for legal services that Chadbourne sent to McCausland contain dozens of entries for Chadbourne's work on structuring the new business entities, including numerous hours billed for research, meetings and conference calls, and planning work. *See id.*

11.        A significant portion of Chadbourne's efforts, for which they billed McCausland, was spent in preparing a chart that depicts the complex structure of the new

3

business venture. *See* Kook Aff., Ex. B. This chart identifies dozens of new entities and diversified businesses to be formed, but nowhere mentions or includes Violy & Co. within the inter-locking chain of holding companies, trusts, and businesses that comprise the new structure proposed by Chadbourne. *See* McCausland Aff., Ex. A. To the contrary, the chart specifically excludes Violy & Co., which is boxed-off in the lower left corner, and designated as an independent and stand-alone company. *Id.* Indeed, Chadbourne's chart represents that McCausland's "Existing Entity (stays)" and that it will remain "100%" owned by "Violy" alone. *Id.*

12.     In the course of Chadbourne's work on this new business structure, McCausland and Navia began discussing the idea that Navia himself could serve as McCausland's partner in this new venture. *See* McCausland Aff., ¶¶ 20-21.

13.     As Navia explained it, Navia could create new streams of income under the new business structure proposed by Chadbourne, including private equity and venture capital work that would supplement, and be separate from, McCausland's mergers and acquisitions work. *See id.* ¶¶ 21, 25.

14.     These discussions did not contemplate that McCausland would bring Navia into her existing business as an owner; to the contrary, Navia expressly told McCausland that he did not want an equity or ownership interest in Violy & Co. *See id.* ¶ 25.

15.     McCausland relied on Navia to draft the written agreement that would formalize the arrangement they were contemplating consistent with Navia's and Chadbourne's representations on the chart that Violy & Co. would remain unaffected. *See* McCausland Aff. ¶¶ 27-28, Ex. A.

16.     The agreement – titled Limited Liability Company Agreement of Violy

4

Group LLC (the "LLC Agreement") – was intended to create a new entity, "Violy Group LLC," which would act as the "managing member" of Violy Holdings, LLC, a Delaware limited liability company," which, in turn, would "(A) own all of the equity of VMS, LLC and (B) create and own a multi-company platform including, without limitation, a new M&A advisory firm, broker-dealer, wealth management firm and private equity firm and such other companies as may be mutually agreed upon." *See* Kook Aff., Ex. A (LLC Agreement), § 2.03(a).

17.    The LLC Agreement provided that McCausland would own 60% of the newly formed Violy Group LLC and Navia, through Core Value, would own 40% of the new entity. *See id.*, Schedule I.

18.    A company called "Violy Holdings LLC" has never existed, according to the database for the Delaware Department of Corporations. *See* Kook Aff. ¶ 6, Ex. E. "VMS, LLC" had been created in Delaware, but ceased good standing before the LLC Agreement was drafted. *See id.* ¶ 5, Ex. D. McCausland never conducted business through an entity under the name Violy Group LLC or VMS, LLC. *See* McCausland Aff. ¶ 49.

19.    The LLC Agreement provided that McCausland would own 60% of the newly formed Violy Group LLC and Navia, through Core Value, would own 40% of the new entity. *See* Kook Aff., Ex. A (LLC Agreement). Violy & Co. was not mentioned anywhere in the agreement, except in a schedule listing addresses for McCausland. *See* Kook Aff., Ex. A (LLC Agreement).

20.    Over a period of many years, through various business dealings, McCausland had developed a close relationship with attorneys at Wachtell, Lipton, Rose & Katz LLP ("Wachtell"). *See* McCausland Aff. ¶¶ 29-30. In early 2008, McCausland asked Wachtell to review several drafts of the LLC Agreement. *See id.* ¶ 29. Attorneys at Chadbourne and

Wachtell exchanged drafts of the LLC Agreement during the first few months of 2008; both firms were engaged by McCausland to review this agreement on her behalf. *See* McCausland Aff. ¶¶ 30-31; Affidavit of Josh Holmes ("Holmes Aff.") ¶¶ 16-18. McCausland was not involved in the exchange of drafts between Chadbourne and Wachtell, but was relying on them to represent her interests as her attorneys. *See* McCausland Aff. ¶¶ 30-31. Indeed, Chadbourne billed McCausland for its work on the LLC Agreement, including billing her for calls with Wachtell and for their work in forming the new entities contemplated under the LLC Agreement. *See* Kook Aff., Ex. B.

21. In the course of reviewing drafts of the LLC Agreement on behalf of McCausland, Wachtell identified a particular provision that it repeatedly deleted from the drafts exchanged with Chadbourne. This provision purported to make the new company contemplated by the LLC Agreement, *i.e.*, Violy Group, the "exclusive vehicle" for Navia and Violy "as it relates to the businesses engaged in by" Violy Group, including "any direct or indirect subsidiary or Affiliate." *See* Kook Aff., Ex. A (LLC Agreement), § 4.04.

22. In each of the drafts on which Wachtell attorneys provided comments, they deleted this exclusivity provision. *See* Holmes Aff. ¶¶ 15-18. Presumably, Navia intended this provision to mean that McCausland could only do business through the new entity being created under the LLC Agreement, even though she never agreed to any such thing. Wachtell never accepted this provision and repeatedly deleted it from the drafts it received from Chadbourne. *See* Holmes Aff. ¶¶ 15-18.

23. The exchange of drafts broke off in May 2008 because Navia advised McCausland that he did not like Wachtell's independent input into the LLC Agreement or its changes to Chadbourne's drafts. *See* McCausland Aff. ¶ 36.

6

24.   Indeed, Navia reinserted the exclusivity provision into a version of the agreement that he claimed to be "final," *see* Holmes Aff. ¶ 19, but Navia never informed McCausland that he had re-inserted this provision into the agreement (or that her lawyers at Wachtell had recommended that it be taken out). *See* McCausland Aff. ¶¶ 38-43. Navia did not attempt to execute the agreement in May 2008 when drafting ceased.

25.   Almost a year after the initial draft of the agreement was first circulated to Wachtell, the LLC Agreement had still not been executed. Indeed, no organizational papers had ever been filed to create the central holding company contemplated under the Agreement, "Violy Holdings." *See* Kook Aff. ¶¶ 4-6.

26.   Meanwhile, Navia and Chadbourne continued to act as legal counsel to McCausland and Violy & Co. in connection with various matters. *See* McCausland Aff. ¶ 30; Kook Aff., Ex. B. It was not until December 2008, more than six months after Wachtell was taken out of the picture by Navia, that Navia determined to execute the LLC Agreement. *See* McCausland Aff. ¶ 34. By that point, Navia had isolated McCausland from the independent advice of outside counsel, and the parties signed a version of the LLC Agreement that contained the very exclusivity provision that Wachtell repeatedly had taken out on McCausland's behalf. Specifically, Navia did not explain that he had reinserted the exclusivity provision that Wachtell had repeatedly removed. *Id.* ¶¶ 37-40, 43

27.   Navia did not advise McCausland at that time that she should consult with independent counsel and he did not explain to her the inherent conflict of interest created when an attorney and a client enter a business transaction, especially one in which that attorney and his firm previously had advised the client. *Id.* ¶¶ 37-44. Navia did not explain the material terms of

the LLC Agreement to McCausland, and he did not discuss with her the fairness of the Agreement.

28.        At no point did Navia, McCausland's counsel, ensure that McCausland fully understood the consequences of signing this Agreement, nor did he advise McCausland that he would claim that under the Agreement she was conveying to him 40% of her existing Violy & Co. business. *See id.* ¶¶ 37-44.

29.        As explained further in the accompanying Memorandum of Law in Support of the Petition, no business was ever carried out through the Violy Group company contemplated by the LLC Agreement, or through any of the various entities Violy Group was intended to own.

30.        Indeed, the only purpose of Violy Group was to serve as "managing member" of Violy Holdings LLC, *see* Kook Aff., Ex. A, § 2.03(a), but that entity was never even created, *see id.* ¶¶ 4-6. Because Violy Holdings was never formed, no stock, income or assets of any companies through which any business could have been conducted was ever transferred, or could ever have been transferred, to Violy Holdings (directly) or to Violy Group (indirectly). Even if Violy Holdings had been created, which it was not, it could not have owned anything because none of the various entities which Violy Holdings was intended to own, including VMS, LLC, was ever created. *See id.*

## NAVIA'S ARBITRATION DEMAND

31.        On March 31, 2011, Respondent served Petitioner with a Demand for Arbitration ("Arbitration Demand"). In the Arbitration Demand, Respondent makes clear that his assertions all are stated against Violy & Co., rather than any of the entities actually named in the LLC Agreement under which the arbitration is brought.

32.        The claims in the Arbitration Demand are: (1) a claim that Core Value owns 40% of Violy & Co. based on the Violy Group LLC Agreement; (2) a claim that Core Value as a member of Violy Group is entitled to an accounting of the affairs of Violy & Co.; (3) a claim for breach of an oral contract that Core Value is entitled to fees from Violy & Co., even though no such fees are set out in the LLC Agreement; and (4) a claim that the Violy Group LLC Agreement entitles Core Value to damages for the "substantial profits" realized by Violy & Co. in connection with its ongoing business. *See* Arbitration Demand ¶¶ 40-50.

## THE ARBITRATION SHOULD BE PERMANENTLY STAYED

33.        Petitioner has filed this Petition on the grounds that (1) the parties did not agree to arbitrate any of the claims asserted by Respondent in the Arbitration Demand, and (2) the agreement between the parties is unethical and invalid under New York law.

34.        As set forth herein, and as explained more fully in the accompanying Memorandum of Law in Support of the Petition, the arbitration provision does not encompass any of the claims in the Arbitration Demand, and the Arbitration Demand must therefore be stayed.

35.        Navia and Core Value cannot satisfy their burden to show an agreement to arbitrate the asserted claims.

36.        None of the claims relates to the new managing entity contemplated by the Agreement (Violy Group LLC), to the holding company (Violy Holdings), or to the entities that the holding company was to possess (VMS, LLC and other, to-be-established, new entities); by its terms Violy & Co. is simply not covered by the Agreement.

37.     Further, as set forth herein, and as explained more fully in the accompanying Memorandum of Law in Support of the Petition, the arbitration must also be stayed because it involves an unenforceable and invalid agreement between an attorney (Navia) and his client (McCausland), which was procured by Navia and Chadbourne in clear violation of Disciplinary Rule 5-104 governing attorney-client business transactions. *See Greene v. Greene,* 56 N.Y.2d 86 (1982).

38.     As explained above, and more fully in the accompanying Memorandum of Law in Support of the Petition, the LLC Agreement at issue here, including any agreement to arbitrate, was procured in violation of Disciplinary Rule 5-104 because (1) Navia and McCausland had "differing interests" in the transaction; (2) McCausland expected her attorneys, Navia and Chadbourne, to exercise their judgment for her protection; (3) the terms of the LLC Agreement were not "fair and reasonable," at least as Navia purports to construe the Agreement in his arbitration demand; (4) Navia did not advise McCausland to seek the advice of counsel after he resurrected the Agreement and modified it to his advantage and her disadvantage; and (5) McCausland was never informed of and certainly never consented in writing to the conflict of interest.

39.     Under these circumstances, the LLC agreement is invalid and unenforceable and Navia should not be permitted to proceed with the arbitration.

## CHADBOURNE AND PARKE LLP MUST BE DISQUALIFIED

40.     As set forth herein, and as explained more fully in the accompanying Memorandum of Law in Support of the Petition, Chadbourne's disqualification is necessary to prevent a violation of the firm's duties and obligations under the Rules of Professional Conduct.

41.     New York law creates an irrebuttable presumption of disqualification where a party is able to demonstrate: (1) the existence of a prior attorney-client relationship, (2)

that the matters involved in the former and current representations are substantially related, and (3) that the interests of the former and current clients are materially adverse. *See Tekni-Plex, Inc. v. Meyner and Landis*, 89 N.Y. 2d 123, 136 (1996). Each of these elements is met here. In the course of representing McCausland with respect to the creation of new business structures, including the LLC Agreement which forms the basis for the arbitration, Chadbourne was entrusted with confidences of its client, including about her finances and about the operation of her businesses. Absent disqualification, Chadbourne is likely to rely on those confidences in attempting to make its case against McCausland. Indeed, the arbitration demand itself is filled with allegations (which McCausland disputes) which seem to have been derived from McCausland's confidential communications with Chadbourne as counsel. *See* Arbitration Demand.

PRAYER FOR RELIEF

WHEREFORE, for all the reasons stated herein and in the accompanying Memorandum of Law in Support of Petition to Permanently Stay or Enjoin Arbitration and Disqualify Chadbourne & Parke LLP as Counsel, and upon this Petition and the accompanying affidavits and exhibits thereto, Petitioner respectfully requests that the Court:

(1)    Enter an order pursuant to C.P.L.R. § 7503 nullifying the Arbitration Demand served by Respondent against Petitioner McCausland and permanently staying all arbitration proceedings related to the aforementioned demand; and

(2)    Enter an order disqualifying Chadbourne & Parke LLP as counsel for Respondent under the New York Rules of Professional Conduct.

Dated: New York, New York
       April 20, 2011

                              JENNER & BLOCK LLP

                      By:     _____

                              Andrew Weissmann
                              Katya Jestin
                              919 Third Avenue, 37th Floor
                              New York, New York 10022
                              (212) 891-1600

                              SOLOMON BLUM HEYMANN LLP
                              Mark R. Kook
                              40 Wall Street, 35th Floor
                              New York, New York 10005
                              (212) 267-7600

                              *Attorneys for Petitioner*

# McCausland-Seve Affidavit

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------- X

VIOLY McCAUSLAND-SEVE,

                         Petitioner,

           - against -

CORE VALUE PARTNERS (LATIN AMERICA)
LLC,

                     Respondent.

-------------------------------------------------------- X

: Index No. __
:
: **Affidavit of Violy McCausland-**
: **Seve in Support of Petition for a**
: **Permanent Stay of Arbitration**
: **Pursuant to CPLR 7503**

STATE OF NEW YORK   )
                     :
COUNTY OF NEW YORK  )

VIOLY McCAUSLAND-SEVE, being sworn, deposes and says:

I am the owner and sole member of VMS Associates LLC ("VMS Associates"), which

does business under the name Violy & Company ("V&Co."), and I respectfully submit this

Affidavit in support of my Petition to permanently stay the arbitration proceeding entitled, In re

Core Value Partners (Latin America) LLC, Claimant, and Violy McCausland-Seve, Respondent,

AAA No. 131 48 Y 00889 11 (the "Arbitration").

     1.     My former attorney, Talbert Navia, who was my trusted legal advisor for several

years, has commenced the Arbitration, claiming that I agreed to transfer to him or to his

company, Core Value Partners (Latin America) LLC ("Core Value"), a 40% equity interest in

my mergers and acquisitions advisory business, VMS Associates, which does business under the

name V&Co. I never made any such agreement.

     2.     I never signed any agreement that transferred any ownership interest in the

existing V&Co. business to Navia or Core Value. I never agreed to arbitrate any claim

concerning the transfer of an ownership interest in the existing V&Co., or concerning the operation of or fees generated by V&Co.

3.      Navia's ownership claim is based on the baseless assertion that I gave him a 40% ownership interest in my wholly-owned company as a gift, for absolutely nothing in return. Navia has betrayed my trust as his client and is simply trying to steal my business.

4.      Navia's ownership claim is not only unsupportable, it is unseemly, as Navia, and his law firm, Chadbourne & Parke LLP ("Chadbourne"), have represented me personally, and my company, as our attorneys. Navia's fraudulent claim of an ownership interest arises from numerous breaches of duties owed to me, not to mention the breaches of trust and confidence I placed in Navia and Chadbourne.

5.      Navia never added anything of value to V&Co. Instead, Navia has interfered with my business, which Navia has sought to use as a vehicle for his own personal advancement and enrichment by demanding a substantial personal monthly salary, by causing Chadbourne to bill millions of dollars in legal fees by Chadbourne to V&Co. (and also to V&Co.'s clients), and by extending secured loans to his client V&Co. at exorbitant interest rates.

6.      Navia's ownership claim in the Arbitration appears to be based on a written agreement (the "LLC Agreement") that Chadbourne drafted concerning the formation of businesses that are entirely new and different from the preexisting V&Co.

7.      There is no agreement to arbitrate the claims Navia makes and the Arbitration should be dismissed.

I.      **Background**

8.      I started my career in 1979 at Morgan Guaranty Trust Company, where I rose to the position of Managing Director by 1985 and led two groups: Latin American Restructuring

2

Advisory, Mergers & Acquisitions; and Latin American Credit Analysis. Following that role, I served as a partner to the former World Bank president, James D. Wolfensohn, at James D. Wolfensohn, Inc., where I developed the firm's Latin American practice.

9.    In 1997, I co-founded Violy, Byorum & Partners ("VB&P"), where I served as a partner for six years, focusing my work entirely on transactions involving Latin American mergers and acquisitions.

10.    In 2003, I founded VMS Associates, which does business as V&Co., as its sole principal and sole originator of business. To this day, VMS Associates continues to operate and to do business as V&Co., and its business is based on my hand-on expertise built on decades of experience.

11.    V&Co., is a strategic financial and mergers and acquisitions ("M&A") advisory firm with unique expertise in Ibero-American markets and is focused on advising family-owned groups and multinational companies on value-enhancing strategies in the global marketplace.

II.    **Chadbourne & Parke LLP and Talbert Navia, Esq.**

A.    **Attorney-Client Relationship**

12.    Since at least 2006, Chadbourne and one of its partners, Navia, have served as legal counsel to me and my existing M&A advisory business in connection with numerous personal, business and litigation matters.

13.    Chadbourne has served as legal counsel to me and to V&Co. in connection with numerous transactions, contracts, and other corporate matters.

14.    Chadbourne has served as counsel to me in connection with the planning of personal trusts and estates, and in connection with the structuring of my business affairs, specifically including my existing V&Co. business.

3

15.    Chadbourne and Navia also provided day-to-day advice to V&Co. on various business-related matters, including employment matters.

16.    Chadbourne has served as legal counsel to another company in which I am a principal, a cosmetics company called Cobalt Balloon LLC.

17.    Until the events leading up to the Arbitration and this Petition, I considered Navia to be my attorney, a trusted legal and business advisor, and my friend. As part of providing me and my company with legal advice over the past four-plus years, Chadbourne and Navia have learned sensitive and confidential information about me and about my business endeavors, including financial information.

**B.    Chadbourne's Advice on the Creation of New Business Structures**

18.    During 2007, Chadbourne and Navia were providing me legal advice regarding personal estate planning and regarding the creation of new corporate entities through which I could more efficiently conduct business.

19.    As part of that counseling, Navia and Chadbourne prepared a chart that sets forth the structure for a proposed inter-locking complex of new businesses, along with certain personal trusts, that they were going to create and organize for my benefit. A copy of the chart is annexed hereto as Exhibit A. This chart showed that Chadbourne would create new ventures that would remain separate from my existing M&A advisory business, V&Co., and that I would remain "100%" owner of my existing business.

**C.    Business Relationship With Navia**

20.    In the middle of 2007, Navia and I discussed plans to go into business together in connection with the creation of new businesses to generate income.

21.    Navia told me that if he were to become my business partner, he would be able to generate new streams of income from new businesses. As explained to me by Navia, he would devote a substantial amount of his time to creating this new business. Navia represented that, through his extensive experience and his list of clients at Chadbourne, and his experience in private equity and venture capital, he could create this new income through clients which he would bring into the proposed new businesses.

22.    From the time we began discussing a business relationship until December 2008, Navia and I did not formalize a business relationship in writing. During this time, Navia and Chadbourne provided legal services and other assistance to my existing business, and charged V&Co. and me substantial fees for those services. Indeed, Chadbourne and Navia were charging me substantial fees for work related to these new business structures. Navia also provided my existing business and me with loans during this period.

23.    While Navia and I did refer to one another as "partners" during that time, I used that term to reflect that we were working together as business associates. I did not have any technical understanding of the term "partner" in mind when discussing possible business relationships with Navia. I used the term "partner" to refer to Navia generally as a trusted legal and business advisor and collaborator in carrying out business plans.

24.    I understand that Navia in his Arbitration Demand refers to my deposition testimony in a lawsuit, in which I was represented by Chadbourne, where I testified that Navia was my partner and owned 40% of "Violy and Company," which I referred to as a "new firm." As Navia knows -- because his Chadbourne firm was representing me as my attorneys in that lawsuit -- I was specifically referring to the "new firm" which I understood Navia was supposed to be creating. I did not intend to refer to my existing M&A advisory business.

5

25.     At no time in 2007 through 2008 did Navia tell me that he desired or intended to claim for himself, or his Core Value entity, ownership in my existing business. In fact, to the contrary, Navia expressly advised me that he had no interest in purchasing an equity stake in my existing business.

26.     In this regard, Navia told me that he preferred to extend loans to my existing business, in exchange for which he received substantial interest payments from me, instead of buying an equity ownership interest in V&Co. Navia has commenced several lawsuits upon those notes, each of which will be answered with the facts showing (i) that the loans are the product of Navia's failure to properly advise me as my sole attorney on these transaction, and (ii) any outstanding amounts are more than offset by the damages caused to V&Co.'s business by Navia's and Chadbourne's improper conduct.

III.    **The LLC Agreement**

27.     In 2007 and 2008, Navia and I continued to discuss a business relationship for new businesses, along the lines outlined in the Chadbourne-created chart at Exhibit A. As my counselor and trusted advisor, I relied on Navia and his firm, Chadbourne, to draft the paperwork to formalize the relationship in a manner that conformed to the new business arrangement that Navia and I had discussed.

28.     My understanding was that Navia would perform the drafting of a formal agreement that would create the complex new set of structures on which Chadbourne had already been advising me. *See* Exhibit A.

29.     Over a period of many years, though various business dealings, I had developed a close relationship with various attorneys at Wachtell, Lipton, Rose & Katz LLP ("Wachtell").

6

At some point in late 2007 or early 2008, I asked attorneys at Wachtell to review drafts of the LLC Agreement that Navia was preparing on my behalf.

30.     Even though I asked Wachtell to review the drafts, I still considered Chadbourne and Navia to be my attorneys on this and other matters. Indeed, at this same time, Chadbourne and Navia continued to represent, and charge substantial fees to, my existing V&Co. business and me, as well as my cosmetics company, Cobalt Balloon LLC. Chadbourne and Navia charged me fees for preparing this LLC Agreement. At no point did I understand that Chadbourne or Navia could take actions against my interests.

31.     On information and belief, Chadbourne and Wachtell exchanged drafts of the LLC Agreement during the first few months of 2008, but ceased these exchanges as of May 2008. I was not involved in these negotiations, however, as I relied on my legal advisors, Chadbourne and Wachtell, to formalize the details of the LLC Agreement.

32.     My understanding of the LLC Agreement was that it would create a structure of new businesses in which Navia and I would share ownership. I would have a 60% stake, and Navia, through Core Value, would have 40% stake.

33.     As I understood it, and as it was described in my conversations with Navia, the purpose of the LLC Agreement was to create a new business that would generate new streams of income, including cash flow from private equity, private placement, banking and joint venture businesses.

34.     In December 2008, more than six months after Chadbourne and Wachtell had ceased work on the LLC Agreement, Navia met with me in connection with business matters concerning V&Co. Navia, over the preceding months, had performed various administrative

7

functions for V&Co., in addition to representing V&Co and me. as my attorney through Chadbourne.

35.    Navia used his position as my attorney to persuade me that he was ready and willing to build and operate the new businesses identified on the Chart, including the private equity, private placement, broker dealer and other new and diversified business entities.

36.    Many months before the proposed LLC Agreement was signed, Wachtell ceased their involvement on my behalf. Wachtell's involvement stopped because Navia told me that he did not like Wachtell's comments on the draft and did not want Wachtell representing me.

37.    Navia, in connection with executing the LLC Agreement, did not advise me to consult with independent attorneys. As I now know, Navia did not want me to receive any advice from other attorneys that would alert me to the fundamentally unfair and one-sided deal that Navia was intending to use the LLC Agreement to claim. In fact, Navia told me that he did not want any Wachtell attorney involved in connection with Navia's business dealings with me.

38.    Before I signed the LLC Agreement in December 2008, Navia and Chadbourne never advised me of all the material terms of the agreement. Neither Navia nor Chadbourne, my attorneys, ensured that the material terms of the LLC Agreement were fair and reasonable to me.

39.    At no time did Chadbourne or Navia discuss the terms of the LLC Agreement with me to ensure that I fully understood the terms of the proposed agreement. Navia and Chadbourne never fully disclosed the terms of the agreement in a reasonably understandable manner.

40.    Further, in the course of advising me with respect to the proposed new business structure, neither Navia nor Chadbourne ever disclosed the conflict of interest created by Navia entering into a business relationship with me, given the existence of the attorney-client

8

relationship that I had with Chadbourne and with Navia in that same matter, as well as in connection with other matters.

41. At no time did Chadbourne advise me of the conflict of interest created when it undertook to advise and represent me in connection with drafting a business agreement with one of Chadbourne's partners, Navia.

42. Chadbourne never presented me with or obtained a conflict waiver in connection with any of their work, including relating to the new business structures and the LLC Agreement. Navia and Chadbourne never obtained my consent in writing to Navia's conflict of interest in entering into the agreement with me.

43. Chadbourne and Navia never made any disclosures to me concerning the "fairness" or lack thereof of the one-sided transaction that they claim to have been consummated through the LLC Agreement. Navia and Chadbourne never advised me that the agreement I signed contained an "exclusivity" provision that Wachtell had removed in their review on my behalf months before.

44. Navia never mentioned to me that he believed or would claim that the LLC Agreement gave him a 40% ownership interest in my existing business, VMS Associates or V&Co., rather than in the new business.

45. By signing the LLC Agreement, I never intended or agreed that Navia would or should obtain a 40% ownership interest in my existing advisory business, V&Co.

46. By signing the LLC Agreement, I never agreed to arbitrate anything to do with my existing business, V&Co., which to my knowledge and understanding, was not included in or effected by the LLC Agreement. V&Co. is not identified as a party to the LLC Agreement.

9

47.     By signing the LLC Agreement, I did not agree to arbitrate any claim that Navia is entitled to any fees that were earned solely by me through V&Co., including the fee earned by V&Co. in connection with a transaction for the Spanish media company, Promotore Informaciones, S.A. ("PRISA").

48.     Had Navia informed me that his understanding of the LLC Agreement was that it gave him 40% of my existing business for nothing, I would never have signed the LLC Agreement.

49.     To my knowledge, no business was ever conducted through the new business that was the intended purpose of the LLC Agreement.

_____
Violy McCausland-Seve

Sworn to before me this
18TH day of April 2011.

_____
Notary Public

MARK R. SCHOLL
NOTARY PUBLIC, State of New York
No. 01SC6063204
Qualified in New York County
Commission Expires August 27, 2013

10

# McCausland-Seve
# Affidavit

# Exhibit A



# Kook Affirmation

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------ X
                                           :

VIOLY McCAUSLAND-SEVE,             :
                                             :

                      Petitioner,          : **Index No. __**

                                             :

                - against -             : **Affirmation of Mark Kook, Esq. in**
                                             : **Support of Plaintiff's Motion for a**
CORE VALUE PARTNERS (LATIN AMERICA)  : **Permanent Stay of Arbitration**
LLC,                                       : **Pursuant to CPLR 7503**
                                             :

                          Respondent.      :
                                             :
------------------------------------------------------------ X

      MARK KOOK, being an attorney admitted in the State of New York, hereby affirms under penalty of perjury:

      1.     I am an attorney in good standing in the State of New York and represent Petitioner Violy McCausland-Seve in the above-captioned matter.

      2.     Attached hereto as Exhibit A is a true and correct copy of the Arbitration Demand in *In re Core Value Partners (Latin America) LLC, and Violy McCausland-Seve*, AAA No. 131 48 Y 00889 11, received by Petitioner in this matter on March 31, 2011.

      3.     Attached hereto as Exhibit B are true and correct copies of bills for the legal services of Chadbourne & Parke LLP.

      4.     Attached hereto as Exhibit C is a true and correct copy of a record produced from the website of the Delaware Secretary of State for an entity called "Violy Group LLC."

      5.     Attached hereto as Exhibit D is a true and correct copy of a record produced from the website of the Delaware Secretary of State for an entity called "VMS, LLC."

6.     Attached hereto as Exhibit E is a true and correct copy of a page produced by the

website of the Delaware Secretary of State following a corporate records search for an entity

named "Violy Holdings LLC."

Dated: New York, New York
       April 18, 2011

_____
Mark Kook, Esq.
SOLOMON BLUM HEYMANN LLP
40 Wall Street, 35th Floor
New York, New York 10005
(212) 267-7600

2

# Kook Affirmation

# Exhibit A

# EXHIBIT A

American Arbitration Association
*Dispute Resolution Services Worldwide*

**COMMERCIAL ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

**MEDIATION:** *If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box. ☐*
*There is no additional administrative fee for this service.*

| Name of Respondent | | | Name of Representative (if known) | | |
|---|---|---|---|---|---|
| Violy McCausland | | | Andrew Weissman, Esq. | | |
| Address | | | Name of Firm (if applicable) | | |
| c/o Violy & Co. | | | Jenner & Block LLP | | |
| | | | Representative's Address | | |
| 10 East 53rd Street, 34th Floor | | | 919 Third Avenue, 37th Floor | | |

| City | State | Zip Code | City | State | Zip Code |
|---|---|---|---|---|---|
| New York | NY | 10022-5058 | New York | NY | 10022-3908 |

| Phone No. | Fax No. | Phone No. | Fax No. |
|---|---|---|---|
| (212) 486-4900 | | (212) 891-1650 | (212) 891-1699 |

| Email Address: | Email Address: |
|---|---|
| violy@violyco.com | aweissmann@jenner.com |

The named claimant, a party to an arbitration agreement dated January 1, 2008 _____, which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

**THE NATURE OF THE DISPUTE**
The arbitration relates to a dispute over the membership interests in a limited liability company and related distributions by the same.

| Dollar Amount of Claim $10,000,000.00 | Other Relief Sought: ☒ Attorneys Fees ☐ Interest |
|---|---|
| | ☐ Arbitration Costs ☐ Punitive/ Exemplary ☐ Other _____ |

Amount Enclosed $ 3,500.00 _____ In accordance with Fee Schedule: ☒Flexible Fee Schedule ☐Standard Fee Schedule

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:
The three arbitrators, who shall be present or former partners of a reputable investment bank, accounting or law firm.

Hearing locale New York, NY _____ (check one) ☐ Requested by Claimant   ☒ Locale provision included in the contract

| Estimated time needed for hearings overall: | Type of Business: Claimant __Limited liability company__ |
|---|---|
| _____ hours or __5.00__ days | Respondent __Individual__ |

Is this a dispute between a business and a consumer? ☐Yes ☒ No  Does this dispute arise out of an employment relationship? ☐ Yes ☒ No

If this dispute arises out of an employment relationship, what was/is the employee's annual wage range? Note: This question is required by California law. ☐Less than $100,000  ☐ $100,000 - $250,000 ☐ Over $250,000

You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement.

| Signature (may be signed by a representative)   Date: | Name of Representative |
|---|---|
| Thomas E. Butler                March 29, 2011 | Thomas E. Butler |
| Name of Claimant | Name of Firm (if applicable) |
| Core Value Partners (Latin America) LLC | Chadbourne & Parke LLP |
| Address (to be used in connection with this case) | Representative's Address |
| 10805 SW 62nd Avenue | 30 Rockefeller Plaza |

| City | State | Zip Code | City | State | Zip Code |
|---|---|---|---|---|---|
| Miami | FL | 33156-4019 | New York | NY | 10023-0127 |

| Phone No. | Fax No. | Phone No. | Fax No. |
|---|---|---|---|
| (212) 408-5316 | | (212) 408-5100 | (212) 541-5369 |

| Email Address: | Email Address: |
|---|---|
| tnavia@chadbourne.com | tbutler@chadbourne.com |

To begin proceedings, please send a copy of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to: American Arbitration Association, Case Filing Services, 1101 Laurel Oak Road, Suite 100 Voorhees, NJ 08043. Send the original Demand to the Respondent.

Please visit our website at www.adr.org if you would like to file this case online. AAA Case Filing Services can be reached at 877-495-4185.

AMERICAN ARBITRATION ASSOCIATION

---

In The Matter of the Arbitration between

CORE VALUE PARTNERS (Latin America) LLC,

                        Claimant,

           and

VIOLY McCAUSLAND,

                   Respondent.

---

**DEMAND FOR ARBITRATION**

Claimant Core Value Partners (Latin America) LLC ("Core Value" or "Claimant"), by its attorneys Chadbourne & Parke LLP, hereby demands arbitration against Respondent Violy McCausland ("McCausland" or "Respondent"), pursuant to Article IX of the Limited Liability Company Agreement of Violy Group LLC ("Violy Group") dated January 1, 2008 (the "LLC Agreement"). A copy of the LLC agreement is attached as Exhibit C-1.

## NATURE OF THE DISPUTE

1.     This arbitration is brought to rectify Respondent's wrongdoing, establish Claimant's rights as a partner pursuant to the LLC Agreement, and compensate Claimant for all damages occasioned by Respondent's disregard of her legal obligations. As will be seen, Respondent McCausland, an investment banker, persuaded Claimant Core Value and its Executive Member, Talbert Navia ("Navia"),

1

to partner with her to help rescue a struggling business; the partnership was eventually memorialized by the LLC Agreement. Respondent thereafter used Claimant's valuable services and freely borrowed substantial sums from Navia and his children to keep the business afloat and support her extravagant lifestyle, until the business finally managed to secure a multimillion-dollar fee. Respondent then denied the existence of the partnership and absconded with the fee, keeping the money for herself and leaving Claimant, Navia, and his children in the lurch.

## THE PARTIES

2.      Claimant Core Value is a Delaware limited liability company with its principal place of business at 10605 SW 62nd Avenue, Miami, Florida 33156. Navia is the Executive Member of Core Value and, through Core Value, is a principal of Violy Group, which includes VMS Associates LLC d/b/a Violy & Co. ("Violy & Co."). Navia is also a partner at the law firm Chadbourne & Parke LLP, specializing in corporate and private equity work with a particular emphasis on the Latin American market.

3.      Respondent McCausland is an individual residing in New York, New York. McCausland is a principal in Violy Group, which includes Violy & Co. McCausland has worked for approximately thirty years as an investment banker, specializing in the Latin American market.

## FACTUAL BACKGROUND

### Events Preceding the Execution of the LLC Agreement

4.      In 2003, McCausland formed VMS Associates LLC, d/b/a/ Violy &

Co., a boutique investment banking firm based in New York that specializes in Latin

American transactions.  McCausland was by no means new to the world of

investment banking:  she had previously headed JP Morgan's Latin America

investment-banking group, where she had worked for approximately fourteen years.

After being asked to resign from JP Morgan, McCausland worked for several more

years as an investment banker at James D. Wolfensohn, Inc.  She then formed Violy,

Byorum & Partners Holdings, LLC ("VBPH"), another investment banking firm that

focused its efforts on Latin American markets until a dispute among the partners

resulted in its dissolution in 2003.

5.      Navia first became acquainted with McCausland in 2006, when they

were introduced through mutual friends.  At that time Violy & Co. was struggling,

due in part to the dissolution of McCausland's previous partnership, VBPH, and was

operating with but a few employees and suffering from poor morale, weak financials,

significant cash-flow constraints, and a tainted brand in Latin America.  Over the

succeeding months, however, Navia and McCausland became close acquaintances

and friends, and in June 2007 McCausland, hoping to rescue her struggling business,

invited Core Value to become her 50 percent partner.  McCausland was aware of

Navia's demonstrated experience and success handling transactions in the Latin

American market, and she told Navia that she hoped and expected that Core Value and Navia would provide the management skills and intellectual capital she badly needed to help build and expand Violy & Co. into a successful and profitable investment boutique.

6.     Navia initially declined McCausland's invitation to be an equal partner, but he ultimately suggested taking a minority, 20 percent participation. McCausland rejected this suggestion and insisted that Navia take a more significant participation as an incentive to devote time and provide assistance in building the business.  As a result, McCausland and Navia agreed that Core Value would hold a 40 percent interest in Violy & Co., while McCausland retained a 60 percent interest. To celebrate the new partnership, McCausland gave Navia a silver pen from the jeweler Tiffany & Co. with an engraving that referenced their joint ownership of Violy & Co., and she promptly had several calls and meetings at which she announced the new partnership to the Violy & Co. advisory board.

**McCausland Enlists Navia's Assistance in**
**Addressing Violy & Co.'s Immediate Cash-Flow Problems**

7.     Although the parties waited a number of months before preparing a formal partnership agreement, from mid-2007 onward they acted, and held themselves out, as partners.  McCausland also immediately took advantage of this new relationship.  In particular, in July 2007 she and her husband Frederico Seve ("Seve") approached Navia with a request that he provide them with financial assistance, since Violy & Co. had been unable to obtain bank financing due to its

weak financials. As it turned out, Violy & Co. was de facto insolvent and unable to meet its payables; bankers had not been paid any bonuses in several years; salaries were below market; morale was low; and the company faced a number of lawsuits, including an action brought by an employee for bonuses she claimed to have been promised but never paid, and a claim by a relative of McCausland based on a loan that was made to McCausland but not repaid.

8.     As a result of McCausland's need for more and more funds, between July 2007 and March 2010 Navia made or arranged for numerous loans funded not only by personal assets of Navia and his spouse, but also from funds held in the Talbert I. Navia Irrevocable Trust (the "Navia Children's Trust" or the "Trust"), which was operated by Navia's spouse as Trustee and had been established to pay their children's educational and living expenses. With these funds, Navia and the Trust were able to provide a one million dollar line of credit initially to Violy & Co., and subsequently to McCausland and Seve, as well as to a company in which McCausland held an indirect 30 percent interest, Cobalt Balloon, LLC ("Cobalt Balloon").

9.     This credit line was subsequently increased to over two million dollars, and was freely drawn upon and used by McCausland on multiple occasions over several years as if Navia and the Trust were her personal bankers, and as if Violy & Co. was her personal piggybank. Proceeds from the credit line were used not only to provide working capital for Violy & Co. and Cobalt Balloon, but also to enable McCausland and Seve to pay their various debts, including taxes, a mortgage, and

expenses related to a home renovation. The proceeds were also used to support McCausland's lifestyle in the extravagant manner to which she had become accustomed; indeed, in further support thereof, Navia willingly agreed to guarantee McCausland's lease of a Mercedes Benz and, from time to time, paid for entertainment and other expenses.

10.     The loans extended by Navia and the Navia Children's Trust were supported by promissory notes (the "Promissory Notes") that Navia sent to Amparo Zouros, the Controller of Violy & Co.; Tom Masillo, the Chief Financial Officer of Violy & Co.; or Marcus Ribeiro, the Head of Legal Affairs at Violy & Co. ("Ribeiro") for review. The Promissory Notes were based on commercial terms and were secured by McCausland's shares of Violy & Co. and certain artwork. In October 2009, $1,267,500 was repaid. The balance remaining on these loans is $845,000 plus accrued interest.

**McCausland and Navia Discuss Entry Into the LLC Agreement**

11.     In late 2007 McCausland and Navia began discussing specific terms to memorialize the partnership they had undertaken. The partners envisioned that Violy Group would become their exclusive vehicle for developing a multi-company platform. The existing Violy & Co. business would be the core of the new entity, and, with Navia's assistance, Violy & Co. would continue to execute transactions and become profitable.

12.     The initial draft of the LLC Agreement was prepared in November 2007, and as contemplated it provided for McCausland to hold a 60 percent interest in the business, while Core Value would hold a 40 percent interest. Navia then recommended that McCausland retain her own counsel to review, evaluate, and advise her on the terms of the LLC Agreement. He suggested she use Wachtell, Lipton, Rosen & Katz ("Wachtell"), with which McCausland had a relationship, since a Wachtell partner sat on the Violy & Co. advisory board.

13.     The draft LLC Agreement was sent to Wachtell for comment. Wachtell suggested certain changes and then prepared a term sheet confirming the 40 percent/60 percent ownership split with respect to Violy & Co. and other material terms. A copy of the term sheet is attached as Exhibit C-2. Although certain terms on Wachtell's term sheet differed from the arrangement originally discussed by McCausland and Navia, over the course of several drafts Navia ultimately accepted substantially all of the changes to the draft LLC Agreement that Wachtell had suggested.

14.     A number of months then passed before the LLC Agreement was executed. During this time Navia and McCausland continued to act as partners, but Navia was content to allow McCausland as much time as she needed to be comfortable with the partnership, and so he did not insist upon formal execution of the LLC Agreement. Finally, however, at a meeting in December 2008 to discuss partnership business (e.g., Navia and McCausland jointly agreed on bonuses for 2008

and salaries for 2009), McCausland enthusiastically insisted that she and Navia execute the agreement. Navia carefully explained to McCausland the few concerns he had had about the Wachtell draft, and he reviewed with her how the draft had been modified to address those concerns.

15.     McCausland fully understood and accepted those changes, and also insisted on a change of her own: she wanted the agreement to provide that Navia would be Core Value's sole representative with Violy Group, and she wrote that change by hand on page 2 of the LLC Agreement. Each page of the LLC Agreement was then reviewed and initialed by Navia and McCausland, and the agreement was executed by both of them in the presence of Violy & Co. bankers and Ribeiro (Violy's Head of Legal Affairs) during a ceremony held in the main area of the company's offices. Photographs were taken at the time to memorialize the execution of the Agreement.

## The Material Terms of the LLC Agreement

16.     Material terms of the LLC Agreement include the following. Section 2.01 of the LLC Agreement, regarding Formation, provides:

> The parties hereto hereby form a limited liability company pursuant to the Act and upon the terms and conditions in this Agreement. The name of the Company shall be Violy Group LLC, and all business of the Company shall be conducted in such name.

17.     Section 2.02 of the LLC Agreement, regarding Membership Interests and Units, provides:

The initial Members of the Company are [McCausland] and Core
Value, whose full names and addresses are set forth on Schedule I to
this Agreement.  Core Value is the sole and exclusive vehicle of
Talbert l. Navia for the purposes contemplated herein.

18.     According to the Section 2.03(a) of the LLC Agreement, the purpose

of the new company was:

(i) to act as the managing member of Violy Holdings LLC, a Delaware
limited liability company, that shall (A) own all of the equity of VMS
LLC and (B) create and own a multi-company platform including,
without limitation, a new M&A advisory firm, broker-dealer, wealth
management firm and private equity firm and such other companies as
may be mutually agreed upon and (ii) to engage in any and all
activities necessary or incidental to the foregoing and such additional
business activities as are permitted under this Agreement or otherwise
as the Members may agree in writing.

19.     Section 3.01 of the LLC Agreement, regarding Initial Members,

provides the following:

(a)  There shall be one class of Membership Interests in the Company,
which shall be represented exclusively by Units.  The designations,
preferences and relative participating, optional or other special rights,
powers and duties relating to the Units are set forth in this
Section 3.01.

(b)  The holders of Units (i) shall share in each item of Company
income, gain, loss, deduction and credit as provided in Section 5.05,
(ii) shall be entitled on a pro rata basis to such distributions, if any, as
shall be payable thereon from time to time pursuant to Section 5.06,
(iii) except to the extent otherwise provided in Section 8.02, upon
liquidation or dissolution of the Company shall be entitled on a pro
rata basis to all remaining assets after satisfaction of the Company's
liabilities to creditors, and (iv) shall be entitled to one vote per Unit on
matters submitted to a vote or consent of Members.

(c)  Units issued for such consideration as all of the Members
determine to be appropriate and Units issued as set forth in Section
5.01 hereof, shall be deemed to be fully paid and, except to the extent

9

specified in Section 18-607(b) of the Act, non-assessable if the entire
amount of such consideration has been received by the Company in
the form of cash, property or services rendered or a promissory note or
other obligation to contribute cash or property or to perform services.

20.    Pursuant to Section 4.03 of the LLC Agreement, entitled "Restrictions

on Authority," the Managing Member was precluded from taking a number of

enumerated actions without the consent of Core Value. The enumerated actions

included, among other things, distributing cash or property to any Member, removing

a Member, borrowing on behalf of Violy & Co., and adopting an operating budget.

21.    The Definitions under Exhibit A of the LLC Agreement include the

following definition of "Percentage Interest": "with respect to each Member, the

percentage determined by dividing the number of Units owned by such member by

the total number of Units outstanding."

22.    Schedule I to the LLC Agreement allocates to McCausland 60 Units

and a 60 percent membership interest, and allocates to Core Value 40 Units and a 40

percent membership interest.

23.    Section 5.05(a) of the LLC Agreement, regarding Allocations of Profit

and Loss, In General, provides the following:

Except as otherwise provided in Section 5.05(b) [on Regulatory
Allocations], allocations of income, gain, loss and deduction of the
Company shall be made on a quarterly basis. For each Fiscal Quarter,
such items shall be allocated among the Members in accordance with
their Percentage Interests except as to allocations related to any
proceeds from any future sale of [McCausland]'s equity interest in
Cobalt Balloon ("CB") which shall be: first, 100% of such proceeds to
[McCausland] up to [McCausland]'s share times $10 million
representing the valuation of Cobalt Balloon as of the date of this

Agreement; second, 100% to Core Value up to 40% of the amount in First above. Thereafter, 70% to [McCausland] and 30% to Core Value. If Units of the Company are issued or redeemed during a Fiscal Quarter, the Managing Member shall apportion the items of income, gain, loss and deduction of the Company for such Fiscal Quarter to the periods before and after such issuance or redemption, and shall allocate such apportioned items among the Members in accordance with the Percentage Interests in effect for such periods.

24.     Section 5.06(b) of the LLC Agreement, regarding Additional

Distributions, provides the following:

The Managing Member and Core Value shall on a quarterly basis determine the amount per Unit of Company funds available to be distributed to the Members (in excess of amounts distributed pursuant to Section 5.06(a) [on Tax Distributions] above). Subject to the prior written approval of all of the Members, the Managing Member shall distribute such available funds (or a lesser amount approved pursuant to Section 4.03(a)) to the Members in proportion with the Percentage Interests; provided that distributions related to Cobalt Balloon will follow the profit and loss allocation in Section 5.05(a).

**Operation Under the LLC Agreement**

25.     Both before and after execution of the LLC Agreement, McCausland

and Navia were actively involved in all aspects of the management of Violy & Co.

This included participating in project meetings, planning and executing new

compensation plans, providing banker reviews, managing cash-flow, pursuing new

business opportunities, and engaging in strategic planning.

26.     All material decisions regarding Violy Group and Violy & Co. were

also made jointly by Navia and McCausland, as contemplated by the LLC

Agreement. For example, McCausland and Navia determined salaries for the year

2009, and they jointly gave bankers' reviews. They also pursued critical strategic

initiatives such as the establishment of management and technology consulting businesses, creating an affiliate network, standardizing compensation arrangements for advisory board members who brought transactions to Violy & Co., pursuing private equity opportunities, and hiring critical employees.  Despite Violy & Co.'s poor financial condition, McCausland and Navia also together agreed to give bonuses for 2008 because morale had been low at the company.  The ability to provide such bonuses was in large part due to the line of credit provided by Navia and his children's trust fund.

27.    During this time period McCausland repeatedly and emphatically identified Navia as her "partner."  References to the partnership were made in numerous communications with Navia, as well as communications with advisory board members, employees, clients, and competitors, and in Violy & Co.'s marketing materials.  Indeed, McCausland's full and informed agreement to and acceptance of Navia/Core Value as her partner was confirmed in December 2009.  At that time, she swore under oath, during a deposition held in an action in which her brother's brother-in-law had sued her for non-payment of a loan, that Navia was her "partner" and that he owned 40 percent of the company.

**Core Value Fees**

28.    The partners agreed that Core Value would receive monthly management fees.  However, because the company needed to preserve cash, the

partners agreed that the amount of Core Value's fees would initially be set at $20,000 per month, with top-up payments being made as cash flow improved.

29.     No Core Value fees were paid for 2007. Moreover, although for the period between January 2008 and December 2009 Core Value was entitled to $480,000 in fees, in order to preserve liquidity only $200,000 was paid, and $280,000 remains outstanding. In addition, Core Value was entitled to an additional $240,000 in fees for the year 2010, none of which has been paid.

### The LLC Agreement Is Amended to Allocate Profit to McCausland for 2008

30.     In early 2009, in the course of preparing Violy & Co.'s tax returns, Thomas Masillo, the company's Chief Financial Officer, recommended to Navia that the parties amend the LLC Agreement to provide for the allocation of 100 percent of taxable income to McCausland. Masillo indicated that the net income for 2008 was $1.2 million, but that in fact there was no cash to make any distributions, including tax distributions contemplated by Section 5.06(a) of the LLC Agreement. According to Masillo, this was because of the company's expenses and McCausland's personal cash needs. As a result, he believed it would be unfair for Core Value to pay taxes on phantom income without receiving any cash distributions. The amendment was specific for the fiscal year 2008, but the parties followed the same practice in fiscal year 2009. A copy of the amendment is attached hereto as Exhibit C-3.

**McCausland Distances Herself from Navia**
**and Denies the Existence of the Partnership**

31.    During the second half of 2009, after McCausland and Navia had worked to restructure Violy & Co.'s financial reporting and cash-flow management, McCausland became somewhat non-responsive to emails regarding the company's financial condition and strategy. For example, McCausland and Navia never met to approve the 2010 budget despite numerous requests by Navia.

32.    Nevertheless, in late February 2010, Navia received an urgent request to provide additional cash to the company. The request came in an e-mail from Henry Harper ("Harper"), McCausland's son, who had recently begun working for Violy & Co. In his message, Harper told Navia that in the "spirit of the partnership" Navia should arrange for additional funds to be loaned to Violy & Co. Thereafter, Core Value raised $1.1 million as a loan from various investors, including $250,000 from Navia personally, which was in addition to $100,000 that Navia had loaned earlier.

33.    Also in 2010, Violy & Co. was scheduled to close a significant transaction for a Spanish media company, Promotora Informacciones, S.A. ("PRISA"), for which it is believed that Violy & Co. was to receive between $15 and $18 million in fees. For the first time in the course of the partners' relationship, this fee promised to finally extricate Violy & Co. from its continually precarious financial position and generate significant profits for the partnership. However, when the company's draft 2010 budget was finally created (without Navia's participation), a

significant portion of that fee was allocated to McCausland, and nothing was allocated to Core Value. Navia then emailed various members of Violy & Co. management to alert them to the error in this allocation and to seek to have it corrected, as the fee should have been marked for distribution to both members of Violy Group, i.e., McCausland and Core Value. Navia received no response to this request.

34.    As 2010 progressed, McCausland became even more distant from and non-responsive to Navia, resisting any attempts at communication. Then, in late 2010, McCausland informed Navia (through intermediaries) that she disputed whether Core Value had any ownership interest in Violy & Co. McCausland claimed, for the first time, that the LLC Agreement was intended to apply only to certain new businesses. McCausland, however, never explained how this could be when she had repeatedly referred to Navia as a "partner" to the rest of the world, when she had testified under oath that Navia owned 40 percent of Violy & Co., and when Navia had contributed a significant portion of his time over the previous three years to Violy & Co. activities.

35.    Also in late 2010, despite previous repeated verbal and written promises to pay the Promissory Notes upon receipt of the PRISA fees, McCausland refused to do so and defaulted on the loans made to her by Navia and his children.

36.    On November 12, 2010, Navia and the Navia Children's Trust separately made formal demands for payment under the Promissory Notes.

37.     Because Navia was unable to have any direct communications with McCausland, a representative of Navia attempted to reach a resolution through discussions with her son, Henry Harper. When these efforts also failed, on November 22, 2010, Core Value provided to McCausland a Notice of Intention to Negotiate, commencing the period for negotiations required by Section 9.01 of the LLC Agreement. A copy of the Notice is attached as Exhibit C-4. In the Notice, Core Value reminded McCausland that, pursuant to Section 4.03 of the LLC Agreement, no major actions could be taken without Core Value's consent.

38.     On or about December 10, 2010, Violy & Co. closed the PRISA transaction. McCausland and certain of her colleagues celebrated the closing at the Four Seasons Restaurant in New York. It is believed that Violy & Co. has been paid, or will be paid, between $15 million and $18 million in connection with that deal. No portion of these fees has been paid to Core Value.

39.     Representatives of the partners met a number of times between November 2010 and March 2011 in an effort to resolve the dispute over the LLC Agreement. No resolution was achieved.

### FIRST CLAIM
**(Declaration that Core Value has a 40 Percent
Ownership Interest in Violy Group, Including Violy & Co.)**

40.     After operating Violy & Co. with Core Value under the terms of the LLC Agreement for three years, and after repeatedly acknowledging the existence of

16

the partnership, McCausland has denied that the ownership of Violy & Co. is as set forth in the LLC Agreement.

41.     Claimant seeks a declaration that, under the LLC Agreement, Core Value has a 40 percent ownership interest in the business operated under the name Violy & Co.

42.     Claimant also seeks a declaration that Core Value and McCausland have all of the rights, privileges, and responsibilities set forth in the LLC Agreement with respect to Violy & Co.

## SECOND CLAIM
### (Accounting and Access to Books and Records)

43.     Despite Core Value's 40 percent ownership interest in Violy Group and McCausland's fiduciary duty to Core Value, McCausland has refused to provide any information to Core Value about the financial affairs of Violy & Co.

44.     Claimant seeks an accounting of the affairs of Violy Group, including Violy & Co., for the period beginning in January 1, 2008, through the present.

45.     Claimant also seeks a direction that Respondent, pursuant to Section 7.03 of the LLC Agreement, immediately make all books and records of Violy & Co. available for Claimant's inspection.

## THIRD CLAIM
### (Breach of Contract as to Fees Due and Owing to Core Value)

46.     Pursuant to the parties' agreement, Core Value provided certain management services to Violy & Co., for which Core Value is entitled to fees in the

aggregate amount of at least $720,000. Core Value has been paid only $200,000 of these agreed-upon fees.

47.     By reason of her conduct, Respondent has prevented Violy Group from providing to Core Value the outstanding fees to which Core Value is entitled in an amount totaling at least $520,000 for the years 2008, 2009 and 2010. Claimant seeks an award of those fees.

### FOURTH CLAIM
### (Breach of Contract as to Core Value's Ownership Interest in Violy Group)

48.     During the time that the LLC Agreement was in place, Violy & Co. realized substantial profits in an amount to be determined, including profits arising from fees paid to Violy & Co. by PRISA.

49.     By reason of her conduct, McCausland has acted in breach of material obligations due and owing to Core Value under the LLC Agreement. More specifically, McCausland has prevented Violy Group from recognizing Core Value's 40 percent ownership interest in Violy Group, including Violy & Co., pursuant to Section 3.01 and Exhibit A of, and Schedule I to, the LLC Agreement. As a result of McCausland's breaches, Core Value has not received 40 percent of the profits of Violy Group, including Violy & Co., from the inception of the LLC Agreement to the present.

50.     Claimant believes that Respondent also has taken numerous steps with respect to Violy & Co. that are in violation of the restrictions on authority set forth in Section 4.03 of the LLC Agreement, including making various distributions to

McCausland without the express consent of Core Value.  Claimant seeks damages arising from these breaches.

## REQUEST FOR RELIEF

Claimant Core Value Partners (Latin America) LLC demands that an arbitration panel be convened in New York, New York in accordance with Article IX of the LLC Agreement and, to the extent not inconsistent with that provision, the Commercial Arbitration Rules of the American Arbitration Association, and requests an award against Respondent as follows:

(a)     A declaration that Core Value possesses a 40 percent interest in Violy Group, that the business operated under the name Violy & Co. is a part of Violy Group, and that Core Value and McCausland possess all rights, privileges, and responsibilities with respect to Violy & Co. as are set forth in the LLC Agreement;

(b)     An accounting of the affairs of Violy Group, including Violy & Co., from the inception of the LLC Agreement to the present and a direction that the books and records of Violy & Co. be made available to Claimant;

(c)     An award of all fees owed to Core Value by Violy Group;

(d)     An award directing the distribution to Core Value of 40 percent of the net profit of Violy Group from January 1, 2008 to the present;

(e)     An award of damages arising from any breaches of the LLC Agreement by McCausland; and

(f)     An award of attorneys' fees and costs.

Dated:   New York, New York
         March 29, 2011

CHADBOURNE & PARKE LLP

By

Thomas E. Butler
A Member of the Firm
Attorneys for Claimant
30 Rockefeller Plaza
New York, NY  10112
(212) 408-5100

EXHIBIT C-1

EXHIBIT C-1

**Exhibit C-1, which was attached to the Affirmation of Mark Kook in support of the Notice of Petition in the New York State Supreme Court proceeding, has been reproduced, in its entirety, by Respondent as a more legible copy than otherwise available.**

# LIMITED LIABILITY

## COMPANY AGREEMENT

## OF

## VIOLY GROUP LLC

### Dated as of January 1, 2008

THE LIMITED LIABILITY COMPANY INTERESTS (THE "INTERESTS") OF VIOLY GROUP LLC (THE "COMPANY") HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), THE SECURITIES LAWS OF ANY STATE OR ANY OTHER APPLICABLE SECURITIES LAWS IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS. SUCH INTERESTS MUST BE ACQUIRED FOR INVESTMENT ONLY AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH (I) THE SECURITIES ACT, ANY APPLICABLE STATE SECURITIES LAWS, AND ANY OTHER APPLICABLE SECURITIES LAWS; AND (II) THE TERMS AND CONDITIONS OF THIS AGREEMENT. THE INTERESTS MAY NOT BE TRANSFERRED OF RECORD EXCEPT IN COMPLIANCE WITH SUCH LAWS AND THIS AGREEMENT. THEREFORE, PURCHASERS OF SUCH INTERESTS SHALL BE REQUIRED TO BEAR THE RISK OF THEIR INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

TABLE OF CONTENTS

Page

ARTICLE I     DEFINED TERMS RULES OF CONSTRUCTION.................................1
    1.01    Definitions......................................................................................1
    1.02    Use of Certain Terms......................................................................1
    1.03    Headings and References..................................................................1

ARTICLE II    ORGANIZATIONAL MATTERS ...................................................2
    2.01    Formation........................................................................................2
    2.02    Initial Members................................................................................2
    2.03    Purpose and Powers.........................................................................2
    2.04    Principal Place of Business and Registered Office..............................2
    2.05    Term................................................................................................2
    2.06    Certificate of Formation...................................................................2
    2.07    Agent for Service of Process.............................................................3
    2.08    Liability to Third Parties...................................................................3
    2.09    Qualification in Other Jurisdictions..................................................3
    2.10    Exculpation.....................................................................................3
    2.11    Covered Person................................................................................3

ARTICLE III   AUTHORIZATION AND ISSUANCE OF MEMBERSHIP
              INTERESTS AND UNITS..............................................................4
    3.01    Membership Interests and Units .......................................................4
    3.02    Certificates......................................................................................4
    3.03    Additional Units...............................................................................6

ARTICLE IV   MANAGEMENT .........................................................................6
    4.01    Management of Company..................................................................6
    4.02    Reliance by Third Parties..................................................................7
    4.03    Restrictions on Authority..................................................................7
    4.05    Management Time.............................................................................9
    4.06    Removal and Withdrawal of Members ..............................................9
    4.07    Certain Limitations on Duties and Obligations of the Members ........10
    4.08    Indemnification...............................................................................10
    4.09    Meetings of the Members ...............................................................10
    4.10    Liability of the Managing Member..................................................11

ARTICLE V    CAPITAL; ALLOCATIONS OF NET INCOME AND NET LOSS;
              DISTRIBUTIONS.........................................................................11
    5.01    Capital Contributions; Loans ..........................................................11
    5.02    Additional Funding and Capital Contributions; Issuance of Additional
            Units..............................................................................................12
    5.03    Capital Accounts.............................................................................12

NY3 - 468645.04

Case 1:11-cv-02773-VM    Document 1    Filed 04/25/11    Page 66 of 73

5.04  No Interest on Capital ...................................................13
5.05  Allocations of Profit and Loss ........................................13
5.06  Distributions ...............................................................15
5.07  Withholding .................................................................15

ARTICLE VI    TRANSFERS OF MEMBERSHIP INTERESTS AND UNITS ...............16
6.01  Transfers by the Members ..............................................16
6.02  Assignee's Rights .........................................................16
6.03  Transfers in Violation ...................................................17

ARTICLE VII   BOOKS AND REPORTS .......................................................17
7.01  Books of Account .........................................................17
7.02  Reports .......................................................................17
7.03  Access to Books ...........................................................17
7.04  Tax Matters .................................................................17

ARTICLE VIII  DISSOLUTION, LIQUIDATION, AND TERMINATION ..................18
8.01  Dissolution ..................................................................18
8.02  Liquidation and Termination ..........................................18
8.03  Cancellation of Filings ..................................................18
8.04  Rights of Members ........................................................19
8.05  Reasonable Time for Winding Up ....................................19

ARTICLE IX    ARBITRATION OF DISPUTES ...............................................19
9.01  Arbitration ..................................................................19
9.02  Arbitration Procedures ...................................................19
9.03  Binding Character .........................................................20
9.04  Exclusivity ...................................................................20
9.05  No Alteration of Agreement ............................................20

ARTICLE X     MISCELLANEOUS ..............................................................20
10.01  Confidentiality ...........................................................20
10.02  Notices .....................................................................20
10.03  Binding Effect ............................................................21
10.04  Severability ...............................................................21
10.05  No Set-Off .................................................................21
10.06  Governing Law ...........................................................21
10.07  Counterpart Execution .................................................21
10.08  Amendments ..............................................................21
10.09  Creditors ...................................................................22
10.10  Waiver ......................................................................22
10.11  Entire Agreement ........................................................22

EXHIBIT A     Definitions

SCHEDULE I     Allocation of Membership Interests and Units

## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## VIOLY GROUP LLC

AGREEMENT, dated as of January 1, 2008, by and among Violy McCausland ("Violy"), Core Value Partners (Latin America) LLC, a Delaware limited liability company ("Core Value"), and the Persons who may hereafter execute this Agreement, the names and addresses of which shall be set forth on Schedule 1 hereto. The signatories to this Agreement are hereinafter referred to individually as a "Member," and collectively as the "Members" or the "Parties."

### PRELIMINARY STATEMENTS

The Parties to this Agreement desire to form a limited liability company pursuant to the Delaware Limited Liability Company Act of 1992, as amended.

In consideration of the premises and intending to be legally bound by this Agreement, the parties hereby agree as follows:

### ARTICLE 1

### DEFINED TERMS
### RULES OF CONSTRUCTION

1.01    _Definitions._  As used in this Agreement, capitalized terms defined in the preamble and other Sections of this Agreement shall have the meanings set forth therein, and terms defined in _Exhibit A_ shall have the meanings set forth therein.

1.02    _Use of Certain Terms._  Unless the context of this Agreement requires otherwise, the plural includes the singular, the singular includes the plural, the part includes the whole and "including" has the inclusive meaning of "including without limitation." The words "hereof," "herein," "hereby," "thereunder," and other similar terms of this Agreement refer to this Agreement as a whole and not exclusively to any particular provision of this Agreement. All pronouns and any variations thereof shall be deemed to refer to masculine, feminine, or neuter, singular or plural, as the identity of the Person or Persons may require.

1.03    _Headings and References._  Section and other headings are for reference only, and shall not affect the interpretation or meaning of any provision of this Agreement. Unless otherwise provided, references to Articles, Sections, Schedules, and Exhibits shall be deemed references to Articles, Sections, Schedules, and Exhibits of this Agreement. References to this Agreement include this Agreement as it may be modified, amended, restated or supplemented from time to time pursuant to the provisions hereof. A reference to any Law shall mean that Law as it may be amended, modified or supplemented from time to time, and any successor Law.

## ARTICLE II

## ORGANIZATIONAL MATTERS

2.01   Formation. The parties hereto hereby form a limited liability company pursuant to the Act and upon the terms and conditions in this Agreement. The name of the Company shall be Violy Group LLC, and all business of the Company shall be conducted in such name.

2.02   Initial Members. The initial Members of the Company are Violy and Core Value, whose full names and addresses are set forth on Schedule I to this Agreement. *Core Value is the sole and exclusive vehicle of Talbert X. Navia for the purpose contemplated herein.*

2.03   Purpose and Powers.

(a)      The purpose of the Company is (i) to act as the managing member of Violy Holdings LLC, a Delaware limited liability company, that shall (A) own all of the equity of VMS LLC and (B) create and own a multi-company platform including, without limitation, a new M&A advisory firm, broker-dealer, wealth management firm and private equity firm and such other companies as may be mutually agreed upon and (ii) to engage in any and all activities necessary or incidental to the foregoing and such additional business activities as are permitted under this Agreement or otherwise as the Members may agree in writing.

(b)      The Company shall possess and may exercise all of the powers and privileges granted by the Act or by any other Law or by this Agreement, together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the business purposes or activities of the Company.

2.04   Principal Place of Business and Registered Office. The location of the principal place of business of the Company shall be determined by the Members. The registered office of the Company in the State of Delaware is located at Delaware Corporate Services Inc., 222 Delaware Avenue, Wilmington, Delaware 19801.

2.05   Term. The term of the Company shall commence on the date its certificate of formation described in Section 18-201 of the Act is filed in the office of the Secretary of State of the State of Delaware in accordance with the Act and shall continue until the winding up and liquidation of the Company and its business is completed as provided in Article VIII hereof.

2.06   Certificate of Formation. The Managing Member is hereby designated as an "Authorized Person," within the meaning of the Act, to execute, deliver and file any amendments, restatements, corrections or cancellation of the Company's certificate of formation and any other certificates required or permitted by the Act to be filed in the office of the Secretary of State, all in accordance with the provisions of this Agreement.

2.07   Agent for Service of Process. The registered agent for service of process on the Company in the State of Delaware shall be Delaware Corporate Services Inc., 222 Delaware Avenue, Wilmington, Delaware 19801 or any successor as appointed by the Managing Member in accordance with the Act.

-2-

2.08   Liability to Third Parties.  The debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company; and no Covered Person shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Covered Person.

2.09   Qualification in Other Jurisdictions.  The Managing Member shall cause the Company to be qualified, formed or registered if necessary under assumed or fictitious name statutes or similar laws in any jurisdiction in which the Company transacts business.  The Managing Member, as authorized persons, within the meaning of the Act, shall execute, deliver and file any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

2.10   Exculpation.  No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement.  A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any person as to matters the Covered Person reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits, losses or net cash flow or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

2.11   Covered Person.  For purposes of this Article II, "Covered Person" shall mean the Managing Member, a Member, any affiliate of the Managing Member or a Member, any officers, directors, shareholders, partners, members, employees, representatives or agents of the Managing Member or a Member, or their respective affiliates, or any employee or agent of the Company or its affiliates.

ARTICLE III

AUTHORIZATION AND ISSUANCE
OF MEMBERSHIP INTERESTS AND UNITS

3.01   Membership Interests and Units.

(a)   There shall be one class of Membership Interests in the Company, which shall be represented exclusively by Units.  The designations, preferences and relative participating, optional or other special rights, powers and duties relating to the Units are set forth in this Section 3.01.

(b)   The holders of Units (i) shall share in each item of Company income, gain, loss, deduction and credit as provided in Section 5.05, (ii) shall be entitled on a pro rata basis to

-3-

NY3 - 468645.04

such distributions, if any, as shall be payable thereon from time to time pursuant to Section 5.06, (iii) except to the extent otherwise provided in Section 8.02, upon liquidation or dissolution of the Company shall be entitled on a pro rata basis to all remaining assets after satisfaction of the Company's liabilities to creditors, and (iv) shall be entitled to one vote per Unit on matters submitted to a vote or consent of Members.

       (c)    Units issued for such consideration as all of the Members determine to be appropriate and Units issued as set forth in Section 5.01 hereof, shall be deemed to be fully paid and, except to the extent specified in Section 18-607(b) of the Act, non-assessable if the entire amount of such consideration has been received by the Company in the form of cash, property or services rendered or a promissory note or other obligation to contribute cash or property or to perform services.

       3.02    <u>Certificates</u>.

       (a)    <u>Issuance of Certificates</u>. The Company may issue one or more certificates in the name of each Member certifying that the Member named therein is a Member on the books and records of the Company and stating the number of Units held. The certificate shall also include as a part thereof a form of assignment sufficient, subject to Section 6.01 hereof, to convey such Member's Units to an assignee under the Act. Upon the transfer of Units in the Company, the Company may issue one or more replacement certificates according to procedures that the Managing Member may establish. Each distribution in respect of a Unit shall be paid by the Company only to (i) the record holder of the certificate for such Unit as of the record date set for such distribution, and (ii) any other Person to the extent designated in writing by the record holder of the certificate for such Unit. Such payment shall constitute full payment and satisfaction of the Company's liability in respect of such payment, regardless of any claim of any other Person who may have any interest in or with respect to such payment by reason of any assignment or otherwise.

       (b)    <u>Register</u>. The Company shall keep a register that, subject to any requirements as determined by the Managing Member, will provide for the registration and transfer of Units. The Managing Member shall act as registrar and transfer agent for the purpose of registering Units and transfers of Units.

       (c)    <u>Lost, Stolen or Destroyed Certificates</u>. The Company shall issue a new certificate in place of any certificate previously issued if the registered owner of the certificate:

       (i)    makes proof by affidavit, in form and substance satisfactory to the Company, that a previously issued certificate has been lost, destroyed or stolen;

       (ii)    requests the issuance of a new certificate before the Company has notice that the certificate has been acquired by a purchaser for value in good faith and without notice of an adverse claim;

       (iii)    if requested by the Managing Member, delivers to the Company a bond, in form and substance satisfactory to the Managing Member with such surety or sureties and

with fixed or open penalty as the Managing Member may direct, in its sole discretion, to indemnify the Company against any claim that may be made on account of the alleged loss, destruction or theft of the certificate; and

(iv)     satisfies any other reasonable requirements as may be reasonably imposed by the Managing Member.

(d)     Registered Owner. The Company shall be entitled to treat the record holder of any Units as the Member holding such Units. The Company shall not be bound to recognize any equitable or other claim to or interest in such Units on the part of any other Person, whether or not the Company shall have actual or other notice hereof.

(e)     Legend. All certificates representing Units now or hereafter issued shall be endorsed as follows:

> "The Units represented by this certificate have not been registered under the Securities Act of 1933 or applicable state and other securities laws and may not be sold, pledged, hypothecated, encumbered, disposed of or otherwise transferred without compliance with the Securities Act of 1933 or any exemption thereunder and applicable state and other securities laws. The Units represented by this certificate are subject to, and are transferable only in compliance with, the Limited Liability Company Agreement of Violy Group LLC, as the same may be amended from time to time, and may not be sold, pledged, hypothecated, encumbered, disposed of or otherwise transferred except in compliance therewith. A copy of said agreement is on file at the principal office of the Company."

3.03     Additional Units. Subject to the guidelines set forth in this Section 3.03 and the requirements of the Act and other applicable Law, the Managing Member shall have the power to cause the Company to issue additional Units for any Company purpose, at any time or from time to time, for such consideration and on such terms and conditions as the Managing Member and Core Value may jointly determine. The consideration for subscriptions to, or the purchase of, Units shall be paid as provided in Section 5.02 hereof. Units so issued shall be deemed to be fully paid and, except to the extent specified in Section 18-607(b) of the Act, non-assessable if the entire amount of such consideration has been received by the Company in the form of cash, property or services rendered or a promissory note or other obligation to contribute cash or property or to perform services.

ARTICLE IV

MANAGEMENT

4.01     Management of Company.

(a)   **Managing Member.** The Company shall have a managing member (the "Managing Member") who shall act as a "manager" of the Company within the meaning of the Act whose duties are subject to the terms of this Agreement. Except as otherwise provided in this Agreement, the management of the Company shall be vested in the Managing Member, who shall have the full and exclusive right, power and authority to manage the business and affairs of the Company to the extent provided in the Act and as set forth in this Agreement. The initial Managing Member shall be Violy.

(b)   **Authority of Managing Member.** The Managing Member shall have the authority on behalf and in the name of the Company to perform all acts necessary or convenient to the objects and purposes of the Company in accordance with this Agreement.

(c)   **Standard of Conduct.** The Managing Member shall discharge its duties in accordance with the standards of conduct set forth below:

(i)   The Managing Member shall discharge its duties in a manner it reasonably believes to be in the best interests of the Company. The Managing Member shall, in the performance of its duties, be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports, or statements presented to it by any Person (including, without limitation, legal counsel and public accountants) as to matters that the Managing Member reasonably believes are within such Persons' professional or expert competence and who has been selected with reasonable care by or on behalf of the Managing Member.

(ii)   The Managing Member shall act in the best interests of the Company and its direct and indirect subsidiaries in her capacity as the Managing Member or officer of the foregoing entities (and not as an individual) when participating in or voting on matters presented at meetings (or otherwise).

(d)   **Term.** The initial Managing Member shall serve for the life of the Company unless such term is earlier terminated due to death, disability, adjudication of incompetency, resignation or removal in accordance with this Agreement. Successor Managing Members may be appointed only with the prior approval of Core Values and shall serve for the life of the Company unless any such term is earlier terminated due to death, disability, adjudication of incompetency, resignation or removal in accordance with this Agreement.

(e)   **Delegation.** The Managing Member may delegate to any Person any of the duties, powers, and authority vested in it hereunder on such terms and conditions as the Managing Member may consider appropriate. Any Person so appointed shall be subject to removal at any time at the discretion of the Managing Member and shall report to and consult with the Managing Member at such times and in such manner as the Managing Member may direct.

(f)   No Member Rights. No Member, in his capacity as such, shall have any power or authority to act on behalf of the Company or to manage the business of the Company,

-6-