except as expressly provided in this Article IV or as delegated to such Member by the Managing Member pursuant to Section 4.01(e) above.

4.02 **Reliance by Third Parties**. Persons dealing with the Company are entitled to rely conclusively upon the power and authority of the Managing Member as set forth in this Agreement.

4.03 **Restrictions on Authority**.

(a) **Actions Requiring Unanimous Approval**. The Managing Member shall not be authorized to undertake any of the following actions without the prior approval of the Core Value:

(i) **Contravention**. Do any act in contravention of this Agreement or, when acting on behalf of the Company, engage in activities inconsistent with this Section 4.03 hereof;

(ii) **Impossibility**. Do any act which would make it impossible to carry on the ordinary business of the Company, or any direct or indirect subsidiary or Affiliate, except as otherwise provided in this Agreement;

(iii) **Possession of Property**. Under any circumstances possess property of the Company or any direct or indirect subsidiary, or, except as otherwise provided in this Agreement, assign rights in specific property of the Company, or any direct or indirect subsidiary or Affiliate, for other than a Company or subsidiary purpose;

(iv) **Acquisitions, Mergers, Etc.** Cause or permit the Company, any direct or indirect subsidiary or Affiliate to acquire the stock or assets of another Person, merge or consolidate with or into any corporation, business trust or association, real estate investment trust, limited liability company, partnership (whether general or limited), common law trust, or unincorporated business;

(v) **Disposition of Property**. Cause or permit the Company or any direct or indirect subsidiary or Affiliate to distribute, sell or otherwise dispose of its interest, directly or indirectly, in the stock or assets of the Company, any direct or indirect subsidiary or Affiliate, except, in connection with the dissolution and winding up of the Company, any direct or indirect subsidiary of Affiliate pursuant to Article VIII;

(vi) **Distributions**. Cause or permit the Company, any direct or indirect subsidiary or Affiliate to make any distribution of cash or property to any Member except (A) distributions in redemption of Units pursuant to Section 4.05(d), (B) distributions in respect of taxes pursuant to Section 5.06(a), and (C) distributions in connection with the dissolution and winding up of the Company pursuant to Article VIII;

(vii) **Removal of Members**. Remove a Person as a Member;

-7-

(viii) <u>Compensation of Members</u>. Determine the compensation, including salary, fixed bonus and performance-based bonuses, to be paid by the Company, or any other direct or indirect subsidiary or Affiliate, if applicable, to any Member of the Company;

(ix) <u>Adoption of Operating Budget</u>. The adoption of the Operating Budget for the Company, any direct or indirect subsidiary or Affiliate;

(x) <u>Selection of Counsel, Etc.</u> Appoint counsel, independent auditors, principal banking institutions, public relations and advertising agencies for the Company or any direct or indirect subsidiary or Affiliate (including any projects hereunder);

(xi) <u>Borrowings</u>. The borrowing by the Company, any direct or indirect subsidiary or Affiliate of any money or the incurrence of any other indebtedness, including the opening of any letters of credit and the granting of any guarantees of the debt of any other Person, or the material amendment or alteration of any documentation previously entered into by the Company, any direct or indirect subsidiary or Affiliate respecting any such indebtedness; <u>provided, however</u>, that the initial Members hereunder shall each have authority to cause any of them to borrow up to $150,000 if the other Member is not available to consent to such borrowing;

(xii) <u>Material Contracts</u>. Executing on behalf of the Company or any direct or indirect subsidiary or Affiliate any contract (including leases, joint ventures or similar contracts) if such contracts require the Company, any direct or indirect subsidiary or Affiliate to make payments or the material amendment or alteration of any such contract previously entered into by the Company, any direct or indirect subsidiary or Affiliate;

(xiii) <u>Loans</u>. The making of any advances or loans to any Person outside the ordinary course of business of the Company, any direct or indirect subsidiary or Affiliate; <u>provided, however</u>, that the initial Members herewith shall each have authority to cause any of them to lend up to $10,000 if the other Member is not available to consent to such loan;

(xiv) <u>Other Extraordinary Transactions</u>. The making of any payment outside of the ordinary course of the business of the Company, any direct or indirect subsidiary or Affiliate, including in connection with the resolution or settlement of any claims against the Company, any direct or indirect subsidiary or Affiliate;

(xv) <u>Compensation to Others</u>. Determine the compensation, including salary, fixed bonus and performance-based bonuses, to be paid by the Company, any direct or indirect subsidiary or Affiliate, if applicable, to any Person;

(xvi) <u>Expenses</u>. Incur any expense not included in the "Operating Budget" of the Company, any direct or indirect subsidiary or Affiliate.

-8-

(b) The Managing Member and Federico Save shall jointly sign on behalf of the Company all checks in excess of $1,000 and within the operating budget of the Company, direct or indirect subsidiary or Affiliate.

4.04 **Management Time**. The Members shall devote such time (or, in the case of Core Value, shall cause Talbert Navia to devote such time) as agreed upon and as appropriate to fulfill their respective duties to the business and affairs of the Company. Each of the Members agree that the Company shall be the exclusive vehicle for each of them as it relates to the businesses engaged by the Company, any direct or indirect subsidiary or Affiliate.

4.05 **Removal and Withdrawal of Members**.

(a) **Removal**. Any Member may be only removed for Cause. The removal of a Member shall be effective immediately upon such approval unless otherwise determined by the Members approving such removal.

(b) **Withdrawal**. A Member may voluntarily withdraw from the Company for any reason. A Member shall cease to be a Member of the Company upon his voluntary withdrawal, retirement, death, Permanent Disability, or adjudication of incompetency (in the case of Core Value, the foregoing would apply to Talbert Navia).

(c) **Effect of Removal or Withdrawal**. Immediately upon the effectiveness of a Member's removal or withdrawal, such Member shall cease to have any voting rights or other rights to participate in the management of the Company. If such Member is the Managing Member, such Member's status as Managing Member, shall immediately cease, or a new Managing Member shall be appointed pursuant to Section 4.01(d).

(d) **Redemption of Units**. Promptly (but in no event later than thirty (30) days) following the removal or withdrawal of a Member, such Member (or his successor(s) in interest) shall, at the Company's option, sell to the Company and the Company shall purchase, to the extent it determines to do so, all of such Member's Units for a price equal to the Fair Value of such Units; provided, however, such Member (successor, estate or heirs), at its or her option, shall have the right to own 25% of the Units owned by such Member on the date of withdrawal.

4.06 **Certain Limitations on Duties and Obligations of the Members**. In performing his or her obligations under this Agreement, except for actions taken or not taken in contravention of the non-discretionary terms and provisions of this Agreement, no Member, officer, employee or agent of the Company shall have any liability to the Company or the Members as a result of any action taken or not taken in managing or conducting the business of the Company if, under the "business judgment rule" as from time to time in effect under the General Corporation Law of the State of Delaware and applicable judicial decisions, a director of a Delaware corporation would have no liability for such action taken or not taken, notwithstanding any provision of the Act.

4.07 **Indemnification**. To the fullest extent permitted by Law but subject to the limitations expressly provided in this Agreement, each Member and each officer, employee or

agent of the Company shall be indemnified and held harmless by the Company from and against any and all losses, claims, damages, liabilities, joint or several, expenses (including reasonable legal fees and expenses), judgments, fines, penalties, interest, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, whether civil, criminal, administrative or investigative, in which any such person may be involved, or is threatened to be involved, as a party or otherwise, by reason of the status of such Person as (a) a present or former Member, officer, employee or agent of the Company, or (b) a Person serving at the request of the Company in another entity as an officer, director or employee of such other entity or in a similar capacity, unless it is established that: (x) the act or omission of the Person described in the immediately preceding clauses (a) and (b) (the "Indemnitee") was material to the matter giving rise to the proceeding and the result of either gross negligence or willful misconduct; or (y) the Managing Member actually received an improper personal benefit in money, property or services and did not, upon notice, return the value of the personal benefit to the Company. The termination of any action, suit or proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere, or its equivalent, shall not create a presumption that the Indemnitee acted in a manner contrary to that specified above. Any indemnification pursuant to this Section 4.08 shall be made only out of the assets of the Company.

4.08    **Meetings of the Members**.  Meetings of the Company may be called by any Member at any time. It is intended that the meetings be held on regular monthly intervals at least six (6) times each year. Each Member shall be provided with not less than three (3) days nor more than thirty (30) days advance written notice of any meeting of the Members. The Company may, if appropriate, provide for proxies or written consents which specify a choice between approval and disapproval of any matter to be acted upon by Members at the meeting. A majority of all Members represented in person or by proxy, shall constitute a quorum. Member meetings shall be held at the principal place of business of the Company or at such other location as may be specified in the notice of meeting. Members may participate in and hold a meeting by means of conference telephone, video conference or similar communications equipment by means of which all Persons participating at the meeting can hear each other, and participation in such meetings shall constitute presence in person at the meeting. Each meeting of Members shall be conducted by the Managing Member or such other Person as the Managing Member may appoint. Any action to be taken at a meeting of Members shall require the affirmative vote of a majority of the Units held by Members present, or represented by proxy, at a meeting at which a quorum is present. If the Managing Member receives the necessary approval or consent of the Members to an action, the Managing Member shall be authorized and empowered to implement such action without further authorization by the Members. In the event the approval or consent of the Members is required for any action to be taken by the Company, such approval or consent may be provided in writing, executed by Members necessary to authorize such action at a meeting, in lieu of a meeting of the Members.

4.09    **Liability of the Managing Member**.

(a)    The Managing Member shall not be liable or accountable in damages or otherwise to the Company, any Members or any assignees, or their successors, heirs, administrators or assigns, for losses sustained, liabilities incurred or benefits not derived as a result of errors in judgment or mistakes of fact or law or any act or omission in its capacity as

-10-

NY3 - 408645.04

Managing Member, so long as the Managing Member did not act with gross negligence or willful misconduct.

(b) Any amendment, modification or repeal of this Section 4.14 or any provision hereof shall be prospective only and shall not in any way affect the limitations on the Managing Member's liability to the Company and the Members under this Section 4.14 as in effect prior to such amendment, modification or repeal with respect to claims arising from or relating to matters occurring, in whole or in part, prior to such amendment, modification or repeal, regardless of when such claims may arise or be asserted.

## ARTICLE V

## CAPITAL; ALLOCATIONS OF NET INCOME AND NET LOSS; DISTRIBUTIONS

5.01 <u>Capital Contributions; Loans</u>.

(a) The Members shall make capital contributions to the Company at such times and in such amounts as the Members may mutually agree in writing.

(b) Any Member may make a loan to the Company at such time, in such amount and on such terms as the Managing Member and such Member may mutually agree in writing.

(c) The Managing Member may cause the Company to borrow funds in such amounts and on such terms as shall be determined by the Members. Borrowings shall be repaid on a priority basis before any other distributions to Members are made pursuant to Section 5.06.

(d) Except as provided in this Section 5.01, no Member shall be required to make capital contributions to the Company.

5.02 <u>Additional Funding and Capital Contributions; Issuance of Additional Units</u>.

(a) Subject to the approval of the Managing Member and Core Value as provided in Section 4.03(a), the Managing Member may, at any time and from time to time, determine that the Company requires additional funds ("Additional Funds"). Additional Funds may be raised by the Company in any manner and upon such terms as determined by the Managing Member subject to the approval the Managing Member and Core Value as provided in Section 4.03(a).

(b) Subject to the approval of the Managing Member and Core Value as provided in Section 4.03(a), the Company may raise all or any portion of the Additional Funds by accepting additional capital contributions from existing Members or admitting additional members. In consideration of additional capital contributions from existing Members or capital contributions from new members, the Company may issue additional Units and Membership Interests with such designations, preferences and relative, participating, optional or other special

-11-

NY3 - 488945.04

rights, powers, and duties, subject to Delaware law, including, without limitation: (i) the allocations of items of Company income, gain, loss, deduction and credit to such Membership Interest; (ii) the right to share in Company distributions; and (iii) the rights of such Membership Interest upon dissolution and liquidation of the Company. The capital contributions contemplated by this Section 5.02(b) by existing Members or new members in respect of the issuance of Units shall be in an amount equal to the Fair Value per Unit for the Fiscal Quarter during which such issuance occurs multiplied by the number of Units to be issued to such Member. In the event that the Company accepts capital contributions from existing Members or new members pursuant to this Section 5.02(b), this Agreement (including but not limited to Schedule I) shall be revised by the Managing Member to the extent necessary to reflect the issuance of such Membership Interests and Units upon receipt of any such capital contributions and any new Member shall be required to execute a counterpart to this Agreement.

5.03    Capital Accounts. A Capital Account shall be established for each Member on the books of the Company, which shall be maintained in accordance with this Section 5.03.

(a)    In General. The Capital Account of each Member shall be credited with (i) the amount of cash and the fair market value of any other property contributed by such Member to the Company (net of liabilities assumed by the Company or to which the contributed property is subject), and (ii) the amount of any items of income and gain allocated to such Member pursuant to Section 5.05. The Capital Account of each Member shall be debited by (i) the amount of cash and the fair market value of any other property distributed to such Member (net of liabilities assumed by the Member or to which the distributed property is subject) and (ii) the amount of any items of loss, expense or deduction allocated to such Member pursuant to Section 5.05.

(b)    Adjustments Upon Issuance or Redemption. Effective upon (i) any issuance of Units pursuant to Section 5.02, (ii) any redemption of Units pursuant to Section 4.05(d), (iii) the liquidation of the Company within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g), and (iv) the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company, each Member's Capital Account shall be adjusted upwards or downwards, as the case may be, in accordance with the Treasury Regulation promulgated under Section 704(b) of the Code.

5.04    No Interest on Capital. No Member shall receive any interest or draw with respect to its capital contributions or its Capital Account, except as otherwise provided in this Agreement.

5.05    Allocations of Profit and Loss.

(a)    In General. Except as otherwise provided in Section 5.05(b), allocations of income, gain, loss and deduction of the Company shall be made on a quarterly basis. For each Fiscal Quarter, such items shall be allocated among the Members in accordance with their Percentage Interests except as to allocations related to any proceeds from any future sale of Violy's equity interest in Cobalt Balloon ("CB") which shall be: first, 100% of such proceeds to Violy up to Violy's share times $10 million representing the valuation of Cobalt Balloon as of

-12-

NY3 - 408045.04

the date of this Agreement; second, 100% to Core Value up to 40% of the amount in First above. Thereafter, 70% to Violy and 30% to Core Value. If Units of the Company are issued or redeemed during a Fiscal Quarter, the Managing Member shall apportion the items of income, gain, loss and deduction of the Company for such Fiscal Quarter to the periods before and after such issuance or redemption, and shall allocate such apportioned items among the Members in accordance with the Percentage Interests in effect for such periods.

(b) Regulatory Allocations. To the extent required for the allocations under this Agreement to be respected for United States federal income tax purposes, (i) the losses allocated to any Member pursuant to Section 5.05(a) hereof with respect to any Fiscal Year shall not exceed the maximum amount of losses that can be so allocated without causing such Member to have a deficit in such Member's Capital Account (adjusted as set forth in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)) at the end of such Fiscal Year, (ii) this Agreement shall include a "qualified income offset" within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(d), (iii) allocations shall be made as required pursuant to the "minimum gain chargeback" requirement of Treasury Regulation Section 1.704-2(f), (iv) allocations shall be made as required pursuant to the "partner nonrecourse debt minimum gain" chargeback rules of Treasury Regulation Section 1.704-2(i)(4), (v) nonrecourse deductions (within the meaning of Treasury Regulation Section 1.704-2(b)(1)) for any Fiscal Year shall be specially allocated to the Members in proportion to each of their respective Percentage Interests in the Company, consistent with Treasury Regulation Sections 1.704-2(b)(1) and 1.704-2(e), and (vi) "partner nonrecourse deductions" (within the meaning of Treasury Regulation Section 1.704-2(i)(2)) shall be allocated among the Members in accordance with the ratios in which the Members share the economic risk of loss for the underlying "partner nonrecourse debt" (within the meaning of Treasury Regulation Section 1.704-2(b)(4)), consistent with Treasury Regulation Section 1.704-2(i). The allocations set forth in this paragraph (b) (the "Regulatory Allocations") are intended to comply with the requirements of Treasury Regulation Sections 1.704-1(b), 1.704-2, and 1.752-1 through and including 1.752-5, and shall be interpreted and applied consistently therewith. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offsets either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Section 5.05(b). Therefore, notwithstanding any other provision of this Article V (other than the Regulatory Allocations), the Company shall make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section 5.05(a). If the Treasury Regulations referred to or otherwise relied upon in this paragraph (b) are hereafter changed or if new Treasury Regulations are hereafter adopted, and if the Managing Member believes that such changed or new regulations make it necessary to revise the allocations set forth in this paragraph (b) or provide further special allocation rules in order to avoid or reduce a risk that a portion of any allocation set forth in this Agreement would not be respected for United States federal income tax purposes, the Members shall consider such reasonable amendments to this Agreement as are necessary or desirable, taking into account the interests of the Members as a whole and all other relevant factors to avoid or reduce such risk to the extent possible without

-13-

materially changing the amounts allocable and distributable to any Member pursuant to this Agreement.

(c) *Special Tax Allocations*. In accordance with Section 704(c) of the Code and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed in kind to the capital of the Company, shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its value (as agreed by the Managing Member and the contributing Member) at the time of contribution. Similarly, in connection with the issuance or redemption of Units which results in capital account adjustments described in Section 5.03(b), income, gain, loss, and deduction with respect to any property held by the Company shall, solely for tax purposes, be allocated among the Members so as to take account of variations between the adjusted basis of such property to the Company for federal income tax purposes and its value (as agreed by the Managing Member and the contributing Member) at the time of such admission or redemption in accordance with the Treasury Regulations under Section 704(b) of the Code. In making the allocations described in this Section, the Company shall use the traditional method described in Section 1.704-3(b) of the Regulations. Except as provided above, any elections or other decisions relating to allocations described in this Section 5.05(c) shall be made by the Managing Member in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section 5.05(c) are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of profits, losses or other items, or distributions pursuant to any provision of this Agreement.

5.06 *Distributions*.

(a) *Tax Distributions*. There shall be distributed with respect to each Fiscal Quarter an equal amount per Unit which the Managing Member, with the approval of all of the Members, reasonably determines is necessary and sufficient for the Members to pay income taxes on the profits allocated to them pursuant to Section 5.05. Such distributions shall be made only to Members who own Units on the last day of such Fiscal Quarter, and shall be made only to the extent the Company has funds sufficient to pay such distributions. Upon completion of the financial statements of the Company prepared pursuant to Section 7.02 hereof for any Fiscal Year, the Managing Member, with the approval of all of the Members, shall make a final determination of the amounts described in the immediately preceding sentence for the entire Fiscal Year, and shall forthwith make a distribution to the Members of an amount equal to the excess, if any, of the actual amounts so determined over the quarterly distributions made during such Fiscal Year. If the quarterly distributions made during such Fiscal Year are greater than the actual amount so determined, such excess shall be credited against the next distributions to be made to the Members pursuant to this Section 5.06(a).

(b) *Additional Distributions*. The Managing Member and Core Value shall on a quarterly basis determine the amount per Unit of Company funds available to be distributed to the Members (in excess of amounts distributed pursuant to Section 5.06(a) above). Subject to the prior written approval of all of the Members, the Managing Member shall distribute such available funds (or a lesser amount approved pursuant to Section 4.03(a)) to the Members in

-14-

NY2 - 468645.04

proportion with the Percentage Interests; provided that distributions related to Cobalt Balloon will follow the profit and loss allocation in Section 5.05(a).

5.07 **Withholding.** Notwithstanding any other provision of this Agreement, the Company shall comply with any withholding requirements under any Law and shall remit amounts withheld to and file required forms with applicable taxing authorities. To the extent that the Company is required to withhold and pay over any amounts to any taxing authority with respect to distributions or allocations to any Member, the amount withheld shall be treated as a distribution of cash to such Member pursuant to Section 5.06 in the amount of such withholding. In the event of any claimed over-withholding, Members shall be limited to an action against the applicable taxing authority. If an amount required to be withheld was not withheld from an actual distribution, the Company may reduce subsequent distributions by the amount of such required withholding. Each Member agrees to furnish the Company such forms or other documentation as are necessary to assist the Company in determining the extent of, and in fulfilling, its withholding obligations.

## ARTICLE VI

### TRANSFERS OF MEMBERSHIP INTERESTS AND UNITS

6.01 <u>Transfers by the Members</u>.

(a) To the fullest extent permitted by law, no Member may, directly or indirectly, transfer such Member's Interest without the prior written consent of the Managing Member and Core Value, which consent may be given or withheld in their sole and absolute discretion; provided, that such consent shall not be necessary in the case of a transfer, in trust or otherwise, by a Member of its, his or her units to a Person eligible as a Family Investment Member or, upon such Member's death, to such Member's heirs, unless the Managing Member reasonably determines that the ability to make such transfer would materially increase the likelihood that either the Company, any direct or indirect subsidiary or any Affiliate would be subject to any additional and material tax, legal or regulatory burden. Unless an assignee is admitted as a substitute Member in accordance with Section 6.01(b), a transfer by a Member of all or any part of such Member's Units shall not release such Member from any of such Member's obligations or liabilities, or limit the Managing Member's rights with respect to such Member, of any nature whatsoever arising under this Agreement, and such assignee shall be entitled only to allocations and distributions with respect to its Units and shall have no right to vote such Units, to participate in the management of the Company and shall not have any of the other rights of a Member under this Agreement.

(b) Upon a Member's transfer of all or any part of such Member's Units to any person (including an Affiliate of such Member or a permitted transferee under Section 6.01), such assignee shall be admitted as a substitute Member in lieu of such transferor Member only with the written consent of the Managing Member which consent may be given or withheld in its sole and absolute discretion.

-15-

(c) Each Member agrees, upon request of the Managing Member, to execute such certificates or other documents and perform such acts as the Managing Member deems appropriate after or in connection with the completion of any assignment of Units to preserve the status of the Company as a limited liability company under the laws of any jurisdiction in which the Company is conducting its operations.

(d) Each assigning Member agrees to pay all expenses, including attorneys' fees incurred by the Company in connection with such assignment.

6.02 Assignor's Rights. Any purported assignment of Units or rights attributable to Units which is not in compliance with this Agreement is hereby declared to be null and void and of no force and effect whatsoever. Except as otherwise consented to by the Managing Member, the effective date of an assignment of Units or rights attributable to Units shall be the first day of the month next following receipt by the Managing Member of written notice of assignment and fulfillment of all conditions precedent to such assignment provided for in this Agreement. An assignor that makes an assignment of Units in violation of this Agreement shall for all purposes continue to be treated as the Member hereunder with respect to such Units, and the assignee shall not be entitled to exercise any vote with respect to such Units or otherwise be treated as a party to this Agreement.

6.03 Transfers in Violation. Upon the occurrence of any transfer of Units in violation of any provision of Section 6.01, such Units shall at any time thereafter, at the election of the Managing Member, be canceled without consideration therefor and without any further action by the Company or a transferring Member.

## ARTICLE VII

## BOOKS AND REPORTS

7.01 Books of Account. The Company shall maintain its books and records and shall determine all items of income, gain, loss and deduction and distributions on a cash basis in accordance with principles applicable in determining taxable income or loss for federal income tax purposes for partnerships and consistent with accounting methods used by the Company in determining taxable income or loss for U.S. federal income tax purposes. The Company shall also keep all other records necessary or convenient to record the Company's business and affairs and sufficient to record the determination and allocation of all profits, losses, distributions and other amounts as may be provided for herein.

7.02 Reports. As soon as practicable after the end of each Fiscal Year, there shall be prepared and delivered to each Member a financial statement for the Company consisting of the following: (a) audited income statements and balance sheets for such Fiscal Year, (b) the amount of the distributions to the Members, (c) the effect of such income, losses and/or distributions on the balance sheet of the Company and the Capital Account of each Member, and (d) a report setting forth in sufficient detail all such information and data with respect to the business transactions effected by or involving the Company during such Fiscal Year as shall

-16-

NY3 - 468045.04

enable each Member to prepare all its tax returns in accordance with all relevant laws, rules and regulations then prevailing.

7.03   **Access to Books.** The books and records of the Company shall be available to each Member or its representatives for inspection and audit upon reasonable notice during normal business hours at the principal office of the Company. The Company shall cause its officers to cooperate in such inspection and audit and to provide any of their work papers prepared in connection therewith.

7.04   **Tax Matters.** The Managing Member is hereby designated to be the "Tax Matters Partner" for U.S. federal income tax purposes pursuant to Section 6231 of the Code and for each taxable year of the Company. To the extent provided in Sections 6221 through 6232 of the Code, the Tax Matters Partner is authorized to represent the Company and the Members before taxing authorities or courts of competent jurisdiction in tax matters affecting the Company or the Members in their capacities as Members, and to file any tax returns and execute any agreements or other documents relating to or affecting such tax matters, including agreements or other documents that bind the Members with respect to such tax matters or otherwise affect the rights of the Company and the Members. The Tax Matters Partner is authorized to expend Company funds for professional services and costs associated therewith in connection with its representation pursuant to this Section 7.04.

ARTICLE VIII

DISSOLUTION, LIQUIDATION, AND TERMINATION

8.01   **Dissolution.** The Company shall be dissolved and its affairs shall be wound up upon the first to occur of any of the following:

(a)   the written consent of a majority of the Members;

(b)   the sale or other disposition of substantially all of the assets of the Company or;

(c)   the entry of a decree of judicial dissolution under Section 18-802 of the Act.

8.02   **Liquidation and Termination.** On dissolution of the Company, the Managing Member shall be the liquidator of the Company. The liquidator shall forthwith commence the winding up of the Company's business and the liquidation of its property other than the name. All proceeds from the sale or disposition of the property of the Company shall, to the maximum extent permitted by law, be applied as follows:

(a)   All of the Company's debts and liabilities shall be paid and discharged in the order of priority provided by Law; and

(b)   The balance shall be distributed to the Members in accordance with their relative positive Capital Account balances.

The liquidator(s) may make distributions of the Company's assets in kind. The choice of which, if any, Company assets are to be distributed in kind shall be within the sole discretion of the liquidator(s) and shall be binding upon all Members. For purposes of applying Section 5.06, assets distributed in kind shall be treated as having been sold at Fair Value. Unless otherwise agreed by the Members, distributions of property in kind shall be shared by the Members in accordance with their Percentage Interests. The costs of liquidation shall be borne at the Company's expense.

8.03   **Cancellation of Filings.** Upon completion of the distribution of Company assets as provided in Section 8.02 hereof, the Company is terminated, and the liquidators shall cause a certificate of cancellation to be filed with the Secretary of State of the State of Delaware and shall take such other actions as may be necessary to terminate the Company.

8.04   **Rights of Members.** Except as otherwise provided in this Agreement, each Member shall look solely to the assets of the Company for the amounts distributable to it under this Agreement and shall have no right or power to demand or receive property from any other Member.

8.05   **Reasonable Time for Winding Up.** A reasonable time shall be allowed for the orderly winding-up of the business and affairs of the Company and the liquidation of its assets in order to minimize any losses otherwise attendant upon such winding-up, and the provisions of this Agreement shall remain in effect between the Members during the period of liquidation.

## ARTICLE IX

## ARBITRATION OF DISPUTES

9.01   **Arbitration.** In the event that the Members cannot agree on any matter arising out of or under the terms and conditions of this Agreement or the operation or management of the Company, after using their reasonable efforts to negotiate and resolve their differences in good faith for a period of thirty (30) days from the date of delivery of a notice of intention to negotiate, the Members shall submit the dispute to binding arbitration in New York, New York, in accordance with this Article IX and, to the extent not inconsistent herewith, the Commercial Arbitration Rules of the American Arbitration Association.

9.02   **Arbitration Procedures.** Any arbitration shall be conducted in accordance with the following procedures:

(a)   There shall be three (3) arbitrators, each of whom shall be independent having no affiliation with any of the parties or their counsel. The parties shall use their best efforts to select as arbitrators present or former partners of a reputable investment bank, accounting or law firm. The three (3) arbitrators selected shall constitute the arbitration panel for the arbitration in question.

-18-